[No. D052463. Fourth Dist., Div. One. Sept. 17, 2009.]

WILLIAM K. DIETZ, Plaintiff and Respondent, v.
MEISENHEIMER & HERRON et al., Defendants and Appellants.

774

**COUNSEL**

Stephen M. Hogan for Defendants and Appellants.

Geraci & Lopez and Stephen F. Lopez for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

I.

## INTRODUCTION

In January 2004, Attorney William K. Dietz filed this action against Meisenheimer & Herron and Meisenheimer, Herron & Steele (Meisenheimer). In his complaint, Dietz alleged that he referred a bad faith insurance litigation matter involving Vital Services Company Inc. (Vital) to Meisenheimer. Dietz further alleged that Meisenheimer breached an agreement between Meisenheimer and Dietz to pay Dietz 25 percent of any contingency fee that

Meisenheimer might receive in the Vital matter. Dietz contended that he suffered damages in excess of $260,000 as a result of this breach. Dietz subsequently filed an amended complaint in which he added an allegation that he was a third party beneficiary of a fee agreement between Vital and Meisenheimer, and that Meisenheimer had violated Dietz's rights as a third party beneficiary by failing to pay Dietz his portion of the contingency fee from the Vital matter. Dietz also alleged several related claims, including fraud, money had and received, and conversion.

Prior to trial, Meisenheimer filed a motion for a protective order in which it requested that the court dismiss Dietz's action on the ground that Meisenheimer could not present a complete defense to Dietz's claims without violating ethical duties that it owed to Vital, including the attorney-client privilege. Specifically, Meisenheimer contended that Vital had refused to waive its right to protect from disclosure certain confidential information that Meisenheimer would have to disclose in order to defend against Dietz's claims. After holding an evidentiary hearing on Meisenheimer's motion, the trial court dismissed Dietz's fraud claim, but allowed the remainder of his causes of action to proceed to trial.

A jury found Meisenheimer liable on claims of breach of contract, third party beneficiary breach of contract, money had and received, and conversion, as alleged in the first amended complaint, and awarded Dietz a total of $260,000 in damages. The trial court entered judgment in favor of Dietz pursuant to the jury's verdict.

On appeal, Meisenheimer claims that the trial court violated its right to due process by refusing to dismiss the action in its entirety since Meisenheimer could not present a defense without violating ethical duties it owed to Vital. Meisenheimer also maintains that Dietz's claims are barred as a matter of law due to Dietz's alleged violation of various ethical duties related to this matter. We conclude that the trial court did not violate Meisenheimer's right to due process by refusing to dismiss the action. We further conclude that Meisenheimer forfeited its contention that Dietz's claims are barred as a matter of law because Meisenheimer has not demonstrated that it preserved in the trial court any of its arguments in support of this contention. Accordingly, we affirm the judgment.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 2004, Dietz filed this action against Meisenheimer. In his complaint, Dietz alleged that he had been retained by Vital to represent Vital

in the defense of a workers' compensation claim. Dietz further alleged that Vital's insurer, Mid-Century Insurance Company (Mid-Century), had refused to provide Vital with a defense to the workers' compensation claim. Dietz alleged that he referred Vital to Matthew Herron, a principal at Meisenheimer. According to Dietz, on or about April 28, 1997, Vital entered into a written fee agreement with Meisenheimer (the 1997 Agreement). Dietz alleged that pursuant to the 1997 Agreement, Meisenheimer agreed to prosecute on Vital's behalf a claim for insurance bad faith against Mid-Century, and that, pursuant to the 1997 Agreement, Meisenheimer was to receive certain fees, including "40% of Vital's recovery from Mid-Century, if any." Dietz also alleged that, pursuant to the 1997 Agreement, he was "to receive 25% of the contingency fee and [Meisenheimer] was to receive 75% of the contingency fee."

Dietz alleged that in December 2002, Vital settled its action against Mid-Century and that the contingent portion of the fee from the settlement totaled $1,240,000. Dietz claimed that Meisenheimer paid Dietz only $50,000 rather than the $310,000 that Dietz alleged Meisenheimer owed him. Dietz claimed that as a result of these actions, Meisenheimer had breached a contract with Dietz. In addition, Dietz brought a fraud cause of action in which he alleged that Meisenheimer "never intended to pay [Dietz] 25% of the contingency fee on the Vital Matter as promised." In addition to the breach of contract and fraud claims, Dietz also brought claims for conversion, constructive trust, accounting, and money had and received.

In December 2006, Dietz filed the operative first amended complaint in which he alleged that Meisenheimer had breached an oral contract with Dietz to pay Dietz 25 percent of any contingency fee Meisenheimer might receive in the Vital matter.[1] Dietz also alleged that he was a third party beneficiary of the 1997 Agreement, and that Meisenheimer had breached the 1997 Agreement by failing to pay Dietz his portion of the contingency fee. Dietz alleged several related claims, including fraud, money had and received, and conversion.

In April 2007, Meisenheimer filed a motion for a protective order in which it claimed that Vital's assertion of its right to protect from disclosure certain confidential information precluded Meisenheimer from presenting "a full and complete defense" to Dietz's claims. Meisenheimer requested that the trial court dismiss the action in its entirety and preclude Dietz from any further prosecution of the case. On July 5, 2007, after the conclusion of an

---

[1] The copy of this pleading that is contained in the record on appeal does not bear a file stamp, but is dated December 2006. We assume for purposes of this decision that all documents contained in the record that do not bear a legible file stamp were filed on the date indicated in the document.

evidentiary hearing on Meisenheimer's motion, the trial court dismissed Dietz's fraud claim, but allowed the remainder of the claims to proceed to trial.

On July 17, 2007, after a trial, the jury returned a special verdict in Dietz's favor on the claims for breach of contract, third party beneficiary breach of contract, money had and received, and conversion alleged in the first amended complaint. As to each claim, the jury found that Dietz had suffered $260,000 in damages.

In December 2007, the trial court entered judgment against Meisenheimer in accordance with the jury verdict. The court awarded Dietz a total of $397,431.04, including $260,000 in damages, $129,216.44 in prejudgment interest, and $8,214.60 in costs.

Meisenheimer timely appeals.

## III.

## DISCUSSION

A. *The trial court's refusal to dismiss the case on the ground that Meisenheimer could not present a defense without violating ethical duties owed to Vital did not deprive Meisenheimer of its right to due process*

Meisenheimer contends that the trial court deprived it of due process by refusing to dismiss the case on the ground that Meisenheimer could not present a defense without violating ethical duties it owed to Vital to preserve the confidentiality of Vital's information. Meisenheimer contends both that the trial court applied the wrong legal standard in determining whether to dismiss the case, and that due process required that the entire action be dismissed, because Meisenheimer was unable to present a complete defense to Dietz's claims at trial.[2]

We will assume that the de novo standard of review applies to Meisenheimer's contentions. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304 [30 Cal.Rptr.3d 493, 114 P.3d 742] [stating that independent standard of

---

[2] Meisenheimer's brief contains an argument heading entitled, "The trial court deprived the lawyer-defendants of due process when it forced them to defend themselves without the use of client secrets," and a separate section entitled, "[Meisenheimer] could not fully develop its defenses during discovery or present a complete defense at trial." We address the arguments raised under both of these headings in this section.

review " 'comports with this court's usual practice for review of mixed question determinations affecting constitutional rights' "].)

### 1. Factual and procedural background

In April 2007, Meisenheimer filed a motion for a protective order requesting that the trial court dismiss Dietz's action in its entirety. In its brief in support of the motion, Meisenheimer contended that it could not defend itself "without obtaining discovery of privileged and confidential matters from Vital and its other nonparty lawyers which Vital is (understandably) not willing to permit [Meisenheimer] to obtain."

Meisenheimer supported this contention by describing the procedural history of its efforts to obtain discovery in the case. For example, Meisenheimer noted that Vital had entered into various waivers of its attorney-client privilege and its confidentiality rights, and that the trial court had entered a protective order to preserve the confidentiality of certain matters related to this action. However, Meisenheimer claimed that it was unable to obtain all of the discovery it needed to present its defense. Specifically, Meisenheimer noted that it had been unable to obtain discovery pertaining to Vital's tax planning strategies for the proceeds of the settlement in the bad faith action. Meisenheimer claimed that this evidence was relevant to prove Meisenheimer's contention that it was not liable to Dietz for any referral fee premised on Vital's having paid Meisenheimer the contingency fee specified in the 1997 Agreement, because Vital had not paid that contingency fee. Meisenheimer claimed, instead, that Vital had paid a different fee, which Meisenheimer had negotiated in 2002 during a dispute over fees that occurred near the time of the settlement of the bad faith litigation. Meisenheimer contended that dismissal was required pursuant to *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451 [107 Cal.Rptr.2d 456] (*Solin*), because, according to Meisenheimer, "[t]he client is clearly not willing to permit discovery of critically relevant, but nevertheless privileged, evidence and the defendants are just as clearly unable to present a full and complete defense."[3]

---

[3] Meisenheimer supported its motion for a protective order with a declaration from its attorney and a notice of lodgment of exhibits. The exhibits listed in the notice include various discovery subpoenas that Meisenheimer served on Vital, and on the law firm of Procopio, Cory, Hargreaves & Savitch (Procopio), and one of its partners, Craig Sapin. Sapin began to represent Vital in 2002 in connection with the settlement of the underlying bad faith litigation and tax issues related to the settlement. The listed exhibits also include Procopio's and Sapin's objections to Meisenheimer's discovery requests, and correspondence between Meisenheimer's counsel and Vital's counsel regarding Meisenheimer's discovery requests. However, the record on appeal does not contain the exhibits. In its brief on appeal, Meisenheimer cites its attorney's declaration summarizing the procedural history of Meisenheimer's attempts to obtain discovery, rather than the exhibits that detail that history. In light of our conclusion that Meisenheimer's claim fails on the merits, we assume for the sake of argument that Meisenheimer's motion for a

Dietz opposed the motion, contending that Meisenheimer's motion was "the latest attempt by [Meisenheimer] to . . . hide behind the attorney/client privilege held by . . . [Vital]." As a threshold argument, Dietz argued that the court should deny the motion because Meisenheimer had not moved to compel any of the discovery that it claimed in its motion was critical to its defense. Dietz noted that Vital had executed several waivers of its attorney-client privilege and its right to protect confidential information. According to Dietz, these waivers encompassed "all information relevant to [Meisenheimer's] defense." Dietz argued that the waivers had been necessitated by the fact that Meisenheimer "continued to feign confusion on what [it] can and cannot disclose." Dietz further argued that, in light of these waivers, Meisenheimer should have moved to compel compliance with any discovery requests to which Vital had objected.

Dietz also argued that the court should deny Meisenheimer's motion because Meisenheimer had failed to demonstrate that information pertaining to Vital's taxes had any relevance to the issues in the case. For example, Dietz argued that even assuming that Vital had been motivated by tax considerations to breach the 1997 Agreement, any such motivation was irrelevant, because "the issue would be was there a breach, modification, or rescission that affected Mr. Dietz's right to a referral fee, not why there was a breach, modification, or rescission." Dietz supported his opposition with, among other documents, copies of several of Vital's waivers of the attorney-client privilege to which Dietz referred in his opposition.

Meisenheimer filed a reply brief in support of its motion. With respect to Dietz's contention that Meisenheimer should have filed a motion to compel, Meisenheimer argued that "it would be absurd to impose a duty on Mr. Herron to take *any* position adverse to Vital on *any* claim of confidentiality." Meisenheimer further argued that any contention that Vital had irrevocably waived its right to assert the attorney-client privilege and its right to insist that Meisenheimer protect its confidential information was contrary to well-established case law. With respect to Dietz's relevancy argument, Meisenheimer explained the connection between this case and discovery pertaining to Vital's tax planning strategies, as follows: "Craig Sapin at [Procopio] is Vital's tax attorney. Vital hired him after Mr. Herron and Harvey Levine[4] recovered $3.1 million for [Vital]. [Sapin] was simultaneously engaged in both tax planning and fee negotiations. He is a critical witness concerning the focal issues here, notably the fee Vital ultimately paid and the events and circumstances surrounding the negotiations that led to that payment. Significantly, Sapin began negotiating a new fee for Vital after

protective order and its attorney's declaration accurately summarize the procedural history of its efforts to obtain discovery in this case.

[4] Attorney Levine assisted Meisenheimer in the prosecution of the bad faith litigation.

Mr. Herron refused to go along with Sapin's 'tax planning.' Thus, Sapin's involvement in matters 'related to' taxes cannot be separated from his involvement in matters 'related to' the fee dispute." Meisenheimer contended that its argument for dismissal was particularly strong with respect to Dietz's fraud claim because "all of the evidence regarding the intentions and motivations of everybody in the fee negotiations are highly relevant."

On June 12, the trial court entered an order setting an evidentiary hearing on Meisenheimer's motion. The order stated that at the hearing, the court would consider (1) the relationship between tax issues arising from the bad faith litigation and the fee dispute related to or arising from that litigation; (2) whether Vital had waived the attorney-client privilege and released its lawyers from the duties of confidentiality so as to permit disclosure and discovery of tax-related issues and tax advice related to or arising from the bad faith litigation; and (3) whether Vital should be compelled to disclose records pertaining to tax-related issues and tax advice related to or arising from the bad faith litigation. The court directed the parties to provide notice of the order to Vital and its attorneys.

On June 28, the first day of the evidentiary hearing, Meisenheimer's counsel gave an opening statement in which he further explained Meisenheimer's contentions regarding the relevance of the information pertaining to Vital's taxes. Counsel argued that the subject matter of the tax advice related to "how to handle the settlement proceeds." Counsel further argued that the tax advice had led to "Vital completely repudiating the [1997 Agreement]," and resulted in a "new fee at the end of the case." Meisenheimer's counsel stressed that the tax advice was "clearly relevant" to Mr. Herron's state of mind during the period in which Vital and Meisenheimer were engaged in a fee dispute, and that it was therefore relevant to defend against Dietz's contention that Herron "concocted a fee dispute" in an effort to avoid paying Dietz his referral fee.

In his opening statement, Dietz's counsel contended that the tax advice Vital received regarding the settlement proceeds had no relevance to any of the causes of action at issue in the case, and that Meisenheimer had made no showing to the contrary. Dietz's counsel also argued that the court had an obligation to determine the content of the confidential information that Meisenheimer was claiming was critical to its defense, and also to determine whether Vital would waive any remaining privileges as to that specific · information.

During the evidentiary portion of the hearing, Herron testified that he would not be able to respond to numerous contentions that were at issue in the case without disclosing confidential information pertaining to Vital's tax

planning strategies concerning the proceeds of the settlement in the bad faith litigation. For example, Herron testified that he could not explain the reasons for Meisenheimer's refusal to participate in the tax planning strategies without disclosing Vital's confidential information. Herron did explain that he believed that Vital's tax planning strategies would call into question the veracity of testimony that Vital had provided in the bad faith litigation. However, Herron testified that he could not further explain the basis of this contention without disclosing Vital's confidential information. Herron also testified that at the time of the fee dispute with Vital in late 2002, he wanted to avoid public disclosure of Vital's tax planning strategies because he believed that such disclosure could serve as a basis for setting aside the settlement of the bad faith litigation. Accordingly, Herron decided to "accommodate Vital" in the fee dispute.

During Herron's testimony, Vital's counsel explained that earlier in the litigation, Vital had waived the attorney-client privilege with respect to anything having to do with the fee dispute in the bad faith litigation. Meisenheimer subsequently sought discovery pertaining to tax advice that Vital had received in the bad faith litigation. However, because, in Vital's view, the tax advice had nothing to do with the fee dispute, Vital had refused to waive the attorney-client privilege with regard to this advice.

Vital's counsel also indicated that with respect to any tax information that Meisenheimer currently possessed, Vital was willing to consider waiving any applicable privilege. However, Vital's counsel stated that Meisenheimer's counsel had refused to reveal what information Meisenheimer was claiming it was prohibited from disclosing. After further discussion among the court and counsel for Vital, Dietz and Meisenheimer regarding the scope of Vital's waivers, the court stated that it was the court's "anticipation" that the parties would meet and confer over the weekend regarding the scope of Vital's assertion of the attorney-client privilege. At the close of the hearing, the court formally requested that counsel meet and confer regarding the issues discussed at the hearing.

On July 2, at the outset of the resumption of the evidentiary hearing, Dietz's counsel and Vital's counsel stated that Vital was willing to waive any and all applicable privileges regarding any statements made among Vital and the various attorneys involved in the Vital/Meisenheimer fee dispute concerning tax advice—including Herron.[5]

---

[5] During the meet-and-confer process, Vital reiterated its offer to consider further waivers of the attorney-client privilege. Vital's counsel sent Meisenheimer's counsel a letter that stated in relevant part: "[P]lease provide me by no later than Noon tomorrow, Friday June 29, 2007, with an explanation of what 'tax advice' Mr. Herron believes he needs to disclose in order to

Meisenheimer's counsel responded that he had attempted to discuss the matter with Vital's counsel over the weekend, but that Vital's counsel was not willing to discuss the matter without first being provided a substantive outline of Herron's anticipated testimony. According to Meisenheimer's counsel, Vital's counsel also indicated that Vital was not willing to provide assurances that it would not share the outline with Dietz.[6] In addition, Meisenheimer's counsel stated that over the weekend, he had attempted to obtain additional discovery from Vital, and that Vital's counsel had refused to provide any further discovery. Meisenheimer's counsel also filed a declaration documenting his efforts to meet and confer.

Upon resuming his testimony at the evidentiary hearing, Herron testified that he could not fully explain how the tax advice led him to conclude that Vital intended to repudiate the 1997 Agreement, without disclosing Vital's confidential information that Herron believed was still subject to Vital's assertion of privilege. Herron also testified that despite Vital's waivers, he still could not fully explain how and why he responded to Vital's purported repudiation of the 1997 Agreement without disclosing Vital's confidential information.

On cross-examination, Herron clarified the purported relevance of evidence pertaining to the tax advice, testifying as follows, "The tax advice . . . caused a breakdown of the relationship with the client who eventually refused to perform on the agreement that Mr. Dietz is suing on and has been suing on for four years."

Attorney Sapin testified that he had provided Vital with tax advice regarding how to handle the settlement proceeds of the bad faith litigation. Sapin also testified that he had represented Vital in its negotiations with Meisenheimer regarding fees and costs in the bad faith litigation. Sapin testified that the tax advice consisted of "an attempt to defer part of the settlement proceeds . . . into the next tax year." Sapin explained that he had shared this advice with Herron. According to Sapin, Herron responded that it would be impossible to accomplish that goal. Sapin testified that Herron's

---

defend the above-captioned lawsuit. I will then consult with [Vital] and determine whether they are willing to waive the attorney-client privilege with respect to this specific 'tax advice.' "

[6] The record on this point is as follows: During the weekend meet-and-confer process, Vital's counsel sent a letter to Meisenheimer's counsel stating, "[w]e do not intend to share your response with counsel for Mr. Dietz if it contains information protected by the attorney-client privilege held by our client, [Vital], as you have suggested it will." Meisenheimer's counsel sent a letter to Vital's counsel stating, "Your equivocal response on the subject leaves us confused on your intentions. We would prefer a simple statement from you that you will not share the information we provide." Vital's counsel did not respond to Meisenheimer's counsel's request for additional assurances.

response to the tax planning issue had no effect on the fee dispute between Meisenheimer and Vital, and explained that the fee dispute stemmed from Meisenheimer's attempt to overcharge Vital.

Clifford Stein, who was vice-president of Vital at the time of the fee dispute with Meisenheimer, testified that the fee dispute arose because Meisenheimer was attempting to overcharge Vital for legal services in the bad faith action by requesting fees beyond those provided for in the 1997 Agreement. Stein testified that Herron's refusal to participate in Vital's tax planning strategies had nothing to do with the fee dispute. Stein explained that Meisenheimer and Vital eventually resolved their fee dispute, and that Vital had paid Meisenheimer pursuant to the 1997 Agreement.

After the conclusion of the hearing, the trial court granted Meisenheimer's motion for a protective order in part, and denied the motion in part. The court dismissed Dietz's fraud cause of action, and stated that the remaining five causes of action could proceed to trial.

In explaining the basis for its ruling, the trial court began by outlining the scope of Vital's waivers of the attorney-client privilege as those waivers related to Dietz's causes of action. The court ruled that, "Any and all communications within [sic] the attorneys during the relevant time period and any and all communications between the defendants and their clients regarding all issues, and in particular, the negotiations of fees in 2002 are waived." The court also noted that Vital's attorney had made clear at the hearing that "any and all communications between the parties and each other on tax as well as fee issues was waived." However, the court noted that there were four evidentiary areas over which Vital continued to assert its right to confidentiality: "One, tax advice from [Procopio] i.e., Sapin to Vital. Two, Vital's tax returns and tax files from [Procopio]. Three, arguably any information Mr. Herron developed during his representation of Vital's business operations that [is] inconsistent with the tax position Vital was proposing at the time of the settlement, but that [was] not discussed between any of the parties. And [four], Sapin's advice to Stein regarding the fee dispute."

The court then described its assessment of the degree to which Vital's assertions of confidentiality would impact Meisenheimer's ability to present a defense to Dietz's claims. The court noted that Meisenheimer intended to argue that Dietz could not prevail on any of his claims that were contingent on Vital's performance under the 1997 Agreement because Vital had repudiated that agreement in retaliation for Meisenheimer's refusal to participate in Vital's tax planning strategies. The court noted that Meisenheimer contended that Vital had paid Meisenheimer under a new agreement that was negotiated in 2002 in settlement of their fee dispute, not under the 1997 Agreement.

The court stated that "[t]he terms of the agreements and the modifications thereof will come into evidence based on the terms of the waivers to date. This is the key information necessary to prosecute and defend all of the causes of action except fraud." The court also noted that much of what remained privileged was not related to Meisenheimer's attorney-client relationship with Vital. For example, the court noted that Sapin's advice to Stein regarding the fee dispute would be privileged in any action.

The trial court described the evidence that did arise from Meisenheimer's attorney-client relationship with Vital as "the . . . assertion that Herron had confidential information adverse to the tax advice that somehow impacts fee negotiations."[7] The court noted that this evidence was relevant only to Meisenheimer's motives during the fee dispute with Vital, and that it was therefore relevant only to Dietz's fraud cause of action.[8] Thus, according to the court, "what little evidence there conceivably may be still remaining within the privilege would only relate to explain the defendant's motivations and actions which are issues relevant [only] to fraud and punitive damages."

The court summarized its ruling by stating: "As part of the exercise of its discretion and following the guidance of [*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1169 [32 Cal.Rptr.2d 1, 876 P.2d 487]] in this case, the court has determined the best way to deal with these unique circumstances is to allow [Dietz] to proceed, but to grant the protective order and dismiss the fraud cause of action."

Meisenheimer twice renewed its motion for a protective order during the trial, after plaintiff's counsel made its opening statement and after the close of evidence. The trial court denied both motions.[9]

2.  *Governing law*

    a.  *General principles of law governing the attorney-client relationship*

The attorney-client privilege "authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between

---

[7] Although not mentioned by the court at this point in its ruling, the court earlier stated that information that Herron had learned regarding Vital's tax strategies through communications with Vital or its lawyers was within the scope of Vital's waiver.

[8] The court explained the relevance of Meisenheimer's motives to the fraud claim by stating, "In other words, was this a dispute triggered by a dispute over taxes as [Meisenheimer] contends, or a more disconcerting effort to avoid a referral fee by . . . triggering a new agreement . . . ?"

[9] Meisenheimer does not refer to these renewed motions in its opening brief on appeal. Accordingly, we focus our analysis on the trial court's initial denial of Meisenheimer's motion for a protective order.

attorney and client." (*Solin, supra,* 89 Cal.App.4th at pp. 456–457; see Evid. Code, § 950 et seq.) " 'In California the privilege has been held to encompass not only oral or written statements, but additionally actions, signs, or other means of communicating information. [Citations.]' " (*Solin, supra,* 89 Cal.App.4th at p. 457.)

In addition to the attorney-client privilege, an attorney owes to his or her client the duty of confidentiality outlined in Business and Professions Code section 6068. That statute provides in relevant part, "It is the duty of an attorney to do all of the following: [¶] . . . [¶] (e)(1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (See also State Bar Rules Prof. Conduct, rule 3-100 ["(A) A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client . . ."].) The duty of confidentiality is broader than the attorney-client privilege (*Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 621 [120 Cal.Rptr. 253]) and "survives the termination of the attorney's represen- tation." (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846 [43 Cal.Rptr.3d 771, 135 P.3d 20].)

■ Among those communications subject to the duty of confidentiality and the attorney-client privilege is a written fee contract between an attorney and a client. (Bus. & Prof. Code, § 6149 ["A written fee contract shall be deemed to be a confidential communication within the meaning of subdivision (e) of Section 6068 and of Section 952 of the Evidence Code."].)

An attorney "can reveal confidences to defend against a malpractice claim or in a fee dispute . . . ." (*Styles v. Mumbert* (2008) 164 Cal.App.4th 1163, 1168 [79 Cal.Rptr.3d 880]; see also Evid. Code, § 958 ["There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relation- ship."].) However, Evidence Code section 958 has been construed to apply only when "either the *attorney or client* charges the other with a breach of duty arising from their professional relationship." (*Glade v. Superior Court* (1978) 76 Cal.App.3d 738, 746 [143 Cal.Rptr. 119], italics added; see *Schlumberger Limited v. Superior Court* (1981) 115 Cal.App.3d 386, 392 [171 Cal.Rptr. 413].) "Privileged communications do not become discoverable because they are related to issues raised in the litigation." (*Schlumberger Limited,* at p. 393.) Thus, while the law is not fully settled in this area, we assume for purposes of this decision that there is no exception to the duty to preserve client confidences in a case brought against an attorney by a third party.

b. *Case law regarding instances in which dismissal of a cause
of action is required to protect the confidences of an
attorney's client*

In *General Dynamics Corp. v. Superior Court, supra,* 7 Cal.4th at page 1169
(*General Dynamics*), the Supreme Court considered "an attorney's status as
'in-house' counsel as it affects the right to pursue claims for damages
following an allegedly wrongful termination of employment." The Supreme
Court concluded that, under certain specified circumstances, the attorney
could bring such an action. (*Id.* at pp. 1169–1170.) In describing these
circumstances, the Supreme Court stressed that counsel was not permitted to
breach the attorney-client privilege in order to prove the elements of such a
claim: "[T]he in-house attorney who publicly exposes the client's secrets will
usually find no sanctuary in the courts. Except in those rare instances when
disclosure is explicitly permitted or mandated by an ethics code provision or
statute, it is never the business of the lawyer to disclose publicly the secrets
of the client. In any event, where the elements of a wrongful discharge in
violation of fundamental public policy claim cannot, for reasons peculiar to
the particular case, be fully established without breaching the attorney-client
privilege, the suit must be dismissed in the interest of preserving the
privilege." (*General Dynamics, supra,* 7 Cal.4th at p. 1190.)

The *General Dynamics* court also stressed that trial courts should employ
various equitable measures to enable attorney plaintiffs to bring such claims,
while at the same time protecting their former client's confidences: "[T]he
trial courts can and should apply an array of ad hoc measures from their
equitable arsenal designed to permit the attorney plaintiff to attempt to make
the necessary proof while protecting from disclosure client confidences
subject to the privilege. The use of sealing and protective orders, limited
admissibility of evidence, orders restricting the use of testimony in successive
proceedings, and, where appropriate, in camera proceedings, are but some of
a number of measures that might usefully be explored by the trial courts as
circumstances warrant. We are confident that by taking an aggressive mana-
gerial role, judges can minimize the dangers to the legitimate privilege
interests the trial of such cases may present." (*General Dynamics, supra,* 7
Cal.4th at p. 1191.)

The *General Dynamics* court summarized these holdings by stating: "The
trial courts have at their disposal several measures to minimize or eliminate
the potential untoward effects on both the attorney-client privilege and the
interests of the client-employer resulting from the litigation of such wrongful
termination claims by in-house counsel. Thus, we also hold that, in those
instances where the attorney-employee's retaliatory discharge claim is inca-
pable of complete resolution without breaching the attorney-client privilege,
the suit may not proceed." (*General Dynamics, supra,* 7 Cal.4th at p. 1170.)

In *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378 [99 Cal.Rptr.2d 622] (*McDermott*), the Court of Appeal concluded that shareholders of a corporation could not bring a legal malpractice action against the corporation's outside counsel because the attorney-client privilege—absent the corporation's waiver thereof—would prevent outside counsel from mounting "any meaningful defense." (*Id.* at p. 381.) The *McDermott* court reasoned: "[A] derivative lawsuit for malpractice against corporate outside counsel raises unique attorney-client privilege issues. Because the shareholders are not the holder of the privilege, they do not effect a waiver of that privilege merely by filing their action on the corporation's behalf. As a result, in the absence of a waiver by the corporate client, the third party attorney is effectively foreclosed from mounting any meaningful defense to the shareholder derivative action. Accordingly, and for the reasons expressed herein, we hold such a derivative action against the corporation's outside counsel, necessarily brought in equity, cannot proceed." (*Ibid.*)

The *McDermott* court concluded that the nature of such an action required dismissal, reasoning, "We simply cannot conceive how an attorney is to mount a defense in a shareholder derivative action alleging a breach of duty to the corporate client, where, by the very nature of such an action, the attorney is foreclosed, in the absence of any waiver by the corporation, from disclosing the very communications which are alleged to constitute a breach of that duty." (*McDermott, supra*, 83 Cal.App.4th at p. 385.) The *McDermott* court noted that its reasoning was similar to the rationale underlying the rule prohibiting assignments of legal malpractice actions—namely, that a defendant in such an assigned action would be unable to defend itself in the absence of a waiver from the assigning client. (*Id.* at p. 385.)

In *Solin, supra*, 89 Cal.App.4th 451, an attorney (Solin) retained a law firm (O'Melveny) to obtain advice regarding Solin's representation of his clients. (*Id.* at p. 453.) In seeking this advice, Solin revealed confidential information to O'Melveny that implicated his clients in criminal activities. Solin later sued O'Melveny for professional malpractice. (*Ibid.*) The clients intervened in the action and sought dismissal of Solin's lawsuit in order to prevent disclosure of the confidential information. (*Id.* at p. 454.) The trial court dismissed the action, and the Court of Appeal affirmed. (*Ibid.*)

In describing the basis for the trial court's dismissal, the Court of Appeal stated that O'Melveny intended to offer in evidence handwritten notes (the Notes) drafted by one of its lawyers (Cohen) during his initial meeting with Solin, at which Solin disclosed the confidential information. (*Solin, supra*, 89 Cal.App.4th at p. 461 ["the factual underpinnings of Solin's claim and O'Melveny's defense, including the latter's intention to examine witnesses concerning all of the matters discussed in the Solin/O'Melveny consultation

and to introduce the Notes into evidence to corroborate Cohen's testimony, had been revealed at the time that the trial court ruled on the Clients' motion to dismiss"].) The *Solin* court further noted that the confidential information was critical to O'Melveny's defense: "[T]here can be no doubt that what Solin told O'Melveny in order to obtain legal advice which Solin now claims was faulty is relevant evidence. Thus, the equitable tool that Solin proposes is to preclude O'Melveny's introduction of relevant evidence. Limiting this evidence would give a distorted view of the Solin/O'Melveny consultation, and would keep from the jury the facts that Solin determined that O'Melveny needed to know in order to render a legal opinion, and the facts on which O'Melveny based its legal advice, and would deprive O'Melveny of its right to cross-examine its accuser on the 'critical issue' of Solin's credibility. Clearly, O'Melveny would be prejudiced by the presentation to the factfinder of a limited and distorted view of the facts underlying this lawsuit." (*Id.* at p. 463.)

Acknowledging that the confidential information was critical to O'Melveny's defense, the *Solin* court noted that the trial court would nevertheless have been required to exclude the evidence because the evidence was subject to the attorney-client privilege between Solin and the clients. (*Solin, supra,* 89 Cal.App.4th at p. 463.) The *Solin* court observed that this would allow Solin to "benefit from the exclusion of evidence that could bolster O'Melveny's defense and its credibility," thus allowing Solin to receive an "unfair advantage in his lawsuit against O'Melveny." (*Ibid.*) The *Solin* court reasoned: "It strikes us as fundamentally unfair for a client to sue a law firm for the advice obtained and then to seek to forbid the attorney who gave that advice from reciting verbatim, as nearly as memory permits, the words spoken by his accuser during the consultation. Simple notions of due process counsel against such a procedure. Evidence Code section 958 codifies this sentiment. It provides: 'There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship.' This is so because '[i]t would be unjust to permit a client . . . to accuse his attorney of a breach of duty and to invoke the privilege to prevent the attorney from bringing forth evidence in defense of the charge . . . .' [Citations.] [¶] Here, of course, Solin maintains that he is not invoking his attorney-client privilege vis-à-vis O'Melveny. However, the fact that the Clients' Secrets must be protected from disclosure would yield precisely the same result: Solin would be permitted to sue his lawyers for malpractice, yet gag O'Melveny in defending the charge by preventing full disclosure of all matters counseled upon." (*Id.* at pp. 463–464.)

The *Solin* court also rejected the plaintiff's suggestions that various measures, such as limitations on discovery or the use of protective orders or in camera procedures, could ameliorate the due process problems that

O'Melveny faced in defending against the action. (*Solin, supra,* 89 Cal.App.4th at pp. 464–466.) The court reasoned, "It is only by disclosing exactly what Solin communicated to Cohen as the concerns prompting his retention of O'Melveny that Cohen can cogently explain the reasons that he gave the advice that he did." (*Id.* at p. 466.) Accordingly, the *Solin* court held, "[B]ecause this lawsuit 'is incapable of complete resolution without breaching the attorney-client privilege, the suit may not proceed.' " (*Id.* at p. 467, quoting *General Dynamics, supra,* 7 Cal.4th at p. 1170.)

### 3. Application

#### a. The trial court did not apply the wrong legal standard in determining whether to dismiss Dietz's action

Meisenheimer maintains that the trial court misapplied *Solin* in two critical ways, and thereby applied the wrong legal standard in determining whether to dismiss Dietz's action. We consider each argument in turn.

##### (i) The trial court did not improperly balance the competing interests of the parties

Meisenheimer argues that, under *Solin,* the trial court erred as a matter of law in balancing Dietz's interest in prosecuting the action against Meisenheimer's inability to defend itself without violating its ethical duties.[10] Citing *Solin,* Meisenheimer contends that the decision "prohibits" balancing such interests, and argues that *Solin* stands for the proposition that "no such 'balancing' can ever be fair to a lawyer defendant."

Meisenheimer's contention that *Solin* "prohibits" balancing the competing interests at stake in a case such as this is apparently based on the following quotation from that opinion: "[T]here can be no balancing of the attorney-client privilege against the right to prosecute a lawsuit to redress a legal wrong. Consequently, as [*General Dynamics, supra,* 7 Cal.4th 1164] teaches, unless a statutory provision removes the protection afforded by the attorney-client privilege to confidential communications between attorney and client, an attorney *plaintiff* may not prosecute a lawsuit if in doing so client confidences would be disclosed. (*General Dynamics, supra,* at p. 1190.)" (*Solin, supra,* 89 Cal.App.4th at pp. 457–458, italics added.)

---

[10] Meisenheimer cites a portion of the trial court's ruling on its motion for a protective order, in which the trial court stated the following: "The court has weighed and balanced the competing interests of the parties. On the one hand, we have the plaintiff who wants to proceed with what he feels is a valid case for a referral fee promise by the defendant. On the other hand, we have the defendant claiming an inability to defend itself while not running afoul of the restrictions imposed by the remaining privileged assertion. The court carefully considered the balance of these competing concerns in coming to the ruling on this motion."

The italicized portion of this quotation suggests that the *Solin* court was simply reiterating the *General Dynamics* court's statement that an attorney *plaintiff* may not establish a claim through the disclosure of privileged information. (*Solin, supra,* 89 Cal.App.4th at pp. 457–458.) This is made clear by the *Solin* court's citation to that portion of the *General Dynamics* opinion in which the Supreme Court stated: "[W]here the elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege, the suit must be dismissed in the interest of preserving the privilege." (*General Dynamics, supra,* 7 Cal.4th at p. 1190; see also *Solin, supra,* 89 Cal.App.4th at p. 461 ["*General Dynamics* . . . concern[s] a plaintiff who might need to disclose confidential information in order to make his case against a defendant who is the holder of the privilege."].)

■ The portion of *Solin* that Meisenheimer cites stands merely for the proposition that a lawyer plaintiff may not rely on privileged information in proving the elements of his or her claims. In determining whether a lawyer can satisfy his or her burden of proof, no balancing is permitted, and dismissal is required if the plaintiff cannot satisfy his or her burden of proof without resort to disclosing privileged or confidential information. (*Solin, supra,* 89 Cal.App.4th at p. 462 [stating that whether "a lawyer plaintiff can prove his or her case without disclosure of privileged information can be easily tested, by pretrial proceedings or by a motion for nonsuit after the plaintiff has presented his case-in-chief without the use of the confidential information"].)

*Solin* does not prohibit a trial court from considering the interests of a plaintiff in bringing a potentially meritorious claim that is *not* premised on confidential information, in the course of determining whether a defendant's right to present a *defense* premised on confidential information requires dismissal of the claim. On the contrary, in our view, a trial court is *required* to consider such competing interests before taking the "drastic action" of dismissing a plaintiff's claim. (*General Dynamics, supra,* 7 Cal.4th at p. 1190; see also *id.* at p. 1191 ["[T]rial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege."]; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 310 [106 Cal.Rptr.2d 906] ["Courts following the lead of *General Dynamics* have also emphasized the need in such cases to avoid the unwarranted public disclosure of client confidences, but have agreed it is possible to strike a balance between protecting the employer's sensitive information and permitting the former in-house counsel to maintain her suit."].)

Accordingly, we conclude that it was not improper for the trial court to balance the competing interests of the parties in determining whether to dismiss Dietz's action in its entirety.

> (ii) *Dismissal of a plaintiff's claim based on the due process concerns espoused in* General Dynamics *and its progeny is reserved for the rarest of cases*

Meisenheimer contends that, pursuant to *Solin*, "due process requires dismissal if the lawyer-defendant would be prevented by his duties to his clients from presenting <u>any</u> of the relevant evidence that may bolster the defense. . . ." Meisenheimer implies that the trial court failed to apply this standard, and thereby committed "an error of law. . . ."

Meisenheimer vastly overstates the breadth of the holding in *Solin*. If dismissal were required whenever a lawyer's ethical duties prevented the lawyer from presenting evidence having *any* relevance to the action, without respect to the materiality of the evidence, the "drastic action" of dismissal would become commonplace. (*General Dynamics, supra,* 7 Cal.4th at p. 1190.) Nothing in *Solin*, nor any other authority of which we are aware, requires such a result.

█   Rather, there are at least four factors that a court must consider, under *General Dynamics* and its progeny, before a court may dismiss a case on the ground that a defendant attorney's due process right to present a defense would be violated by the defendant's inability to disclose a client's confidential information if the action were allowed to proceed. First, the evidence at issue must be the client's confidential information, and the client must be insisting that the information remain confidential. (See *Solin, supra,* 89 Cal.App.4th at p. 454 [noting that clients intervened in lawsuit and sought dismissal of action to avoid disclosure of confidential information]; *McDermott, supra,* 83 Cal.App.4th at p. 385 [stating that outside counsel could not reasonably defend shareholder derivative malpractice action "in the absence of any waiver by the corporation"].) To the extent that the information is not confidential, no basis for dismissal exists. (Cf. *General Dynamics, supra,* 7 Cal.4th at pp. 1190–1191 [noting that many claims involving "in-house counsel . . . faced with an ethical dilemma" will be premised on evidence falling "outside the scope of the statutory privilege," including "[m]atters involving the commission of a crime or a fraud"].)

Second, the *McDermott* and *Solin* courts relied heavily on the fact that the confidential information at issue in those cases was highly material to the defendants' defenses. In *McDermott*, the court held that dismissal was proper in a case in which the plaintiff brought a claim that, by its very nature,

necessitated that the defendant disclose privileged or confidential information in order to present "a[] meaningful defense." (*McDermott, supra,* 83 Cal.App.4th at p. 381; see also *id.* at p. 383 [noting that "attorney-client privilege issues [are] *necessarily raised* by a derivative malpractice action against corporate outside counsel" (italics added)].) In *Solin,* the court noted that the confidential information pertained to the "central disputed issues in this case" and that excluding it would result in restricting the defendant's cross-examination of its accuser on a " 'critical issue.' " (*Solin, supra,* 89 Cal.App.4th at pp. 466, 463.)

Third, before dismissing a case on due process grounds, the trial court must determine whether it is able to effectively use "ad hoc measures from [its] equitable arsenal," including techniques such as "sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings," so as to permit the action to proceed. (*General Dynamics, supra,* 7 Cal.4th at p. 1191; see *Solin, supra,* 89 Cal.App.4th at pp. 464–466 [concluding various ad hoc measures would not preserve defendant's right to present a defense under the circumstances of that case].)[11]

Finally, a trial court should consider whether it would be "fundamentally unfair" to allow the action to proceed. (*Solin, supra,* 89 Cal.App.4th at p. 463.) Fundamental fairness in this context is an extension of the principle that, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." (*Chevron Corp. v. Pennzoil Co.* (9th Cir. 1992) 974 F.2d 1156, 1162.) The Courts of Appeal in both *McDermott* and *Solin* relied heavily on this notion, which is embodied in Evidence Code section 958.[12] More specifically, both the *McDermott* and *Solin* courts noted the inherent unfairness in allowing a plaintiff to bring a claim, which, by its very nature necessitates a defense based on confidential information, where the plaintiff has either directly supplied such confidential information to the defendant, as in *Solin,* or where the plaintiff seeks to derivatively represent a third party who has supplied such information to the defendant, as in *McDermott.* (See *Solin, supra,* 89 Cal.App.4th at p. 463

---

[11] It is possible to read *Solin* as suggesting that a trial court is required to employ its "equitable arsenal" (*General Dynamics, supra,* 7 Cal.4th at p. 1191) only in attempting to allow a *plaintiff* to establish a claim. (*Solin, supra,* 89 Cal.App.4th at p. 462.) We would reject any such reasoning. Given that the Supreme Court has encouraged trial courts to use such measures to attempt to allow a plaintiff to establish a claim based, in part, on confidential information (*General Dynamics, supra,* 7 Cal.4th at p. 1191), it follows that trial courts should employ those same measures before dismissing the claim of a plaintiff who, as in this case, can establish his or her claim without resort to confidential information, but who faces a defendant that contends that it cannot mount a defense without disclosing such information.

[12] As noted previously, Evidence Code section 958 provides, "There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship."

[citing Evid. Code, § 958, and stating that it is unfair for a party to sue upon advice provided by an attorney and then seek to prevent the attorney from presenting evidence pertaining to why the advice was given]; *McDermott, supra,* 83 Cal.App.4th at p. 384 [noting that pursuant to Evid. Code, § 958 a plaintiff's filing a malpractice claim against his or her attorney results in a waiver of the privilege to the extent necessary to defend the claim, but that "because a derivative action does not result in the corporation's waiver of the privilege, such a lawsuit against the corporation's outside counsel has the dangerous potential for robbing the attorney defendant of the only means he or she may have to mount any meaningful defense"].)

■ *General Dynamics* and its progeny thus support the notion that a court may take the extraordinary step of dismissing a plaintiff's claim on the ground that an attorney defendant's due process right to present a defense is compromised by the defendant's inability to present confidential information in support of that defense only in the rarest of cases, after the court has considered all of the factors discussed above. On this basis, we reject Meisenheimer's contention that due process requires dismissal if an attorney defendant would be prevented by ethical duties from presenting "*any* of the relevant evidence that may bolster the defense."

> b. *The trial court did not err in refusing to dismiss Dietz's action in its entirety*

Meisenheimer claims that its "duties of confidentiality and fidelity to the Clients" precluded it from presenting a complete defense to Dietz's claims. Accordingly, in this section, we address whether, after considering the factors articulated in part III.A.3.a.(ii), *ante,* Meisenheimer has demonstrated that the trial court violated its right to due process by refusing to dismiss Dietz's action in its entirety.

We begin by considering the nature of the evidence that Meisenheimer was precluded from presenting at trial. As noted in part III.A.1., *ante,* at the conclusion of the evidentiary hearing on Meisenheimer's motion for a protective order, the trial court ruled that the evidence in the following four areas remained privileged and confidential, and thus could not be used by Meisenheimer in defending against Dietz's claims: (1) tax advice given by Procopio to Vital; (2) Vital's tax returns; (3) "any information Mr. Herron developed during his representation of Vital's business operations that [is] inconsistent with the tax position Vital was proposing at the time of the settlement, but that [was] not discussed between any of the parties"; and (4) Attorney Sapin's advice to Stein regarding the Meisenheimer/Vital fee dispute.

Evidence in three of these four areas—(1), (2), and (4)—does not arise from duties owed by Meisenheimer to its clients. More specifically, while advice given by Procopio and Sapin to Vital and Stein is protected by the attorney-client privilege and the duty of confidentiality between *Procopio* and Vital, it is not evidence that arises from an attorney-client relationship between *Meisenheimer* and Vital. The evidence in these three areas did not arise from confidential information shared between Meisenheimer and Vital. Nor does any of the evidence in any of these three categories originate from Dietz. Thus, any limitation on the presentation of evidence in these areas does not implicate the due process concerns addressed in *Solin* and *McDermott*. (*Solin, supra*, 89 Cal.App.4th at p. 464 [party may not be permitted to "gag [attorney defendant] in defending the charge [of malpractice] by preventing full disclosure of all matters counseled upon"]; *McDermott, supra*, 83 Cal.App.4th at p. 384 [action could not proceed where it "effectively places the defendant attorney in the untenable position of having to 'preserve the attorney client privilege (the client having done nothing to waive the privilege) while trying to show that his representation of the client was not negligent' "].) We therefore reject Meisenheimer's claim that its duty to protect Vital's confidential information precluded it from fully presenting its defense insofar as such a claim is based on the trial court's ruling preventing Meisenheimer from presenting evidence in these three areas. Further, Meisenheimer cites no authority for the proposition that a defendant may obtain dismissal of a case merely because some evidence that might be beneficial to the defendant is protected by a privilege and is therefore not subject to discovery and/or may not be introduced in evidence.

Accordingly, in considering the materiality of the evidence excluded in this case, we focus on the third category of confidential information to which the trial court referred in its ruling, namely, "any information Mr. Herron developed during his representation of Vital's business operations that [is] inconsistent with the tax position Vital was proposing at the time of the settlement, but that [was] not discussed between any of the parties." In its brief, Meisenheimer explains the relevance of this information to its defense, in part, as follows: "[Meisenheimer] was forbidden to disclose much of what it knows about Vital, their tax lawyer, and their so called tax planning to explain to the jury just exactly why Vital paid a very different fee from the one in the 1997 contract under which Dietz is making his claim."

We assume the legal validity of Meisenheimer's argument as to the relevance of this evidence.[13] However, Meisenheimer has failed to demonstrate that such evidence was highly material to its defense. First, unlike in

---

[13] In other words, we will assume for purposes of addressing this argument, that Vital's performance under the 1997 Agreement was a condition precedent to any obligation Meisenheimer owed to Dietz to pay a referral fee, and that if Vital paid Meisenheimer pursuant

*Solin* and *McDermott*, the purpose for which Meisenheimer sought to offer the evidence was far from the central issue in the case. As the trial court stated in its order, "The court has, frankly, struggled to determine a logical nexus between the current dispute . . . [and] what remains of the privilege." Even assuming that Vital's performance or nonperformance under the 1997 Agreement was material to Meisenheimer's defense of Dietz's claims, the evidence regarding the tax issue pertained to Vital's purported *motive* for engaging in a fee dispute with Meisenheimer, which was not the core issue of Meisenheimer's defense.

Second, even assuming the relevance of evidence pertaining to Vital's tax considerations in proving Meisenheimer's defense, the scope of the evidence excluded was exceedingly narrow. As the trial court noted, "The terms of the agreements and the modifications thereof [between Vital and Meisenheimer] will come into evidence based on the terms of the waivers to date. This is the key information necessary to prosecute and defend all of the causes of action except fraud."[14] As the court noted elsewhere in its ruling, "Any and all communications within [*sic*] the attorneys during the relevant time period and any and all communications between the defendants and their clients regarding all issues, and in particular, the negotiations of fees in 2002 are waived." The court also stated that, "to the extent defendant heard about tax issues and/or discussed tax issues with any of the parties or lawyers, it is within the scope of the waivers." In light of these broad waivers, Meisenheimer had a significant amount of freedom in constructing its defense. In addition, although we have assumed for the sake of argument, that Meisenheimer actually possessed evidence in this category that it was precluded from introducing at trial, Meisenheimer made no showing in the trial court as to the specific confidential information that it claimed it was forbidden to disclose. Thus, at best, the trial court excluded only a narrow slice of evidence that was not directly relevant to the core issues of the case.

With respect to the use of ad hoc measures that the court might have employed to allow the action to proceed, Vital's counsel repeatedly reiterated that Vital was willing to consider further waivers of its right to preserve confidential information if Meisenheimer would reveal to Vital the information that Meisenheimer was contending it could not disclose. Meisenheimer declined this offer. In a similar vein, in its ruling on Meisenheimer's motion, the trial court stated that Dietz had requested that the court order "an in camera hearing where the court could observe a discussion between the

to an agreement in settlement of their 2002 fee dispute, Meisenheimer would be under no legal obligation to pay Dietz a referral fee.

[14] As noted previously, the trial court dismissed Dietz's fraud cause of action. Dietz has not appealed the trial court's dismissal of the fraud claim.

defendant and the lawyer for Vital and determine whether there was relevant information left within the scope of the privilege." The trial court declined to hold such a hearing.

The record thus indicates that Dietz requested that the trial court determine whether Meisenheimer had an ongoing duty to maintain the confidentiality of information it claimed was relevant to its defense, and that Vital suggested an alternative procedure that may have relieved Meisenheimer of any such duty. Meisenheimer's refusal to reveal, even to its own former client, the confidential information that Meisenheimer contended it had to disclose in order to adequately defend itself in Dietz's action, is an additional factor supporting the trial court's refusal to dismiss Dietz's action in its entirety.

With respect to the fundamental fairness criteria, unlike the plaintiff in *Solin*, plaintiff in this case did not participate in the sharing of confidential information with defendant attorney. The trial court properly distinguished *Solin* on this ground in its ruling on Meisenheimer's motion for a protective order, stating: "In *Solin*, the privileged materials were part of the information transmitted to the defendant[] upon which [its] advice to the plaintiff-attorney was based. Here, Dietz, at least on relevant issues, never consulted with the defendants . . . . Dietz never communicated confidential material relevant to the instant dispute to the client and defendant, and [Meisenheimer] never provided legal advice to Dietz based on confidential material about the client supplied to the defendant by Dietz."

Nor did Dietz seek to " 'stand in the shoes' " of a corporation (*McDermott, supra*, 83 Cal.App.4th at p. 383) to prosecute an action against the corporation's attorney based on the attorney's attorney-client relationship with the corporation. Thus, unlike the actions of the plaintiffs in *Solin* and *McDermott*, Dietz's action does not involve the affirmative use of the confidential information.

Finally, in addition to arguing that its inability to disclose confidential information within its knowledge violated its right to present a defense, Meisenheimer suggests that it was deprived of its right to conduct discovery in areas that the trial court ultimately determined, at the close of the evidentiary hearing, to be within the scope of waivers effectuated by Vital.[15] For example, Meisenheimer asserts that the scope of the Vital's waiver was a "moving target," and that Vital made "a belated consent to certain limited

---

[15] For example, Meisenheimer contends that it was "forbidden to depose Vital's witnesses and subpoena their records because Vital objected whenever [Meisenheimer] tried to do so. . . . With credibility a key issue at trial, Vital's decision to withhold its consent to [a] deposition prevented [Meisenheimer] from conducting the discovery any nonlawyer defendant would routinely obtain . . . ."

disclosure," which resulted in an "ambush" of Meisenheimer. Meisenheimer further argues that the trial court made a "surprise ruling" at the close of the evidentiary hearing that Sapin's advice to Vital regarding the fee dispute was privileged.

We reject Meisenheimer's suggestion that the timing of the trial court's rulings precluded it from conducting appropriate discovery. To begin with, it was Meisenheimer that elected to file the motion for a protective order seeking dismissal of the action on the eve of trial.[16] Moreover, Meisenheimer has not demonstrated that it sought a continuance of the trial so that it could conduct further discovery in light of the trial court's final determination as to the scope of protected information in its ruling on its motion for a protective order. We therefore reject Meisenheimer's contention that its inability to conduct adequate discovery resulted in a violation of its due process right to present a defense.

■ Accordingly, we conclude that the trial court did not err in refusing to dismiss Dietz's action on the ground that Meisenheimer could not present a defense without violating ethical duties it owed to Vital.

## B. *Meisenheimer forfeited its claim that dismissal is required because of Dietz's alleged violation of various ethical duties*

Meisenheimer's opening brief contains an argument section entitled, "Dismissal is fair because Dietz is advancing meritless legal theories in disregard of his own duties to the clients." Under this heading, Meisenheimer contends that dismissal of Dietz's action is "required," for a number of reasons. We conclude that Meisenheimer has forfeited these contentions by failing to demonstrate either that it preserved these arguments in the trial court, or that it may properly raise such arguments for the first time on appeal.[17]

### 1. *Meisenheimer's contentions*

Meisenheimer contends that any referral fee contract between Dietz and Meisenheimer was unenforceable because Dietz failed to adequately obtain

---

[16] Meisenheimer's notice of motion for a protective order indicated that the motion would be heard on June 8 and that trial was set to commence on June 22.

[17] It is not entirely clear from Meisenheimer's brief whether Meisenheimer intends for these arguments to serve as independent bases for reversal of the judgment. To the extent that Meisenheimer intends to present these arguments solely in support of its contention that dismissal would be an appropriate remedy in light of the issues raised in Meisenheimer's motion for a protective order, that contention is moot in light of our conclusion that the trial court did not err in refusing to dismiss the case. To the extent that Meisenheimer seeks to present these arguments as independent bases for reversal of the judgment, we deem them forfeited for the reasons stated in the text.

Vital's informed consent to such a contract, as is required pursuant to rule 2-200 of the State Bar Rules of Professional Conduct. Meisenheimer also contends that the alleged referral contract between Dietz and Meisenheimer was unenforceable because it did not comply with Business and Professions Code section 6147, which governs contingent fee contracts. In addition, Meisenheimer argues that Dietz violated rule 3-310(F) of the Rules of Professional Conduct, which governs the acceptance of compensation from a person other than the client for representing a client. Meisenheimer also contends that Dietz's alternative theory of recovery, namely, that Dietz was a third party beneficiary of Meisenheimer's contract with Vital, fails as a matter of law. In support of this contention, Meisenheimer maintains that an attorney may never be a third party beneficiary of a contract between a client and another attorney because the contracting attorney owes the client a duty of undivided loyalty. Finally, Meisenheimer argues that, in prosecuting this action, Dietz violated a host of other ethical duties that Dietz owed to Vital, including failing to obtain its informed consent prior to disclosing Vital's confidential information.

### 2. *Governing law*

■ "It is a fundamental rule of appellate review that the judgment appealed from is presumed correct and ' " 'all intendments and presumptions are indulged in favor of its correctness.' " [Citation.]' [Citation.] An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citation.]" (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [57 Cal.Rptr.3d 363] (*Benach*).)

In *In re S.C.* (2006) 138 Cal.App.4th 396, 406–407 [41 Cal.Rptr.3d 453], the court described an appellant's burden to demonstrate that it properly preserved its appellate claims in the trial court:

■ "In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court. [Citation.] 'The rule that contentions not raised in the trial court will not be considered on appeal is founded on

considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law.' [Citations.] Otherwise, opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources 'to address purported errors which could have been rectified in the trial court had an objection been made.' [Citation.] In addition, it is inappropriate to allow any party to 'trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable.' [Citation.]

■ "The party also must cite to the record showing exactly where the objection was made. [Citations.] When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited. [Citations.]"

■ Certain exceptions to the duty to preserve claims in the trial court do exist. For example, an appellate court has "discretion to consider an issue not properly raised in the trial court, if it presents a pure question of law on undisputed factual evidence regarding either (1) a noncurable defect of substance such as lack of jurisdiction or failure to state a cause of action, or (2) a matter affecting the public interest or the due administration of justice." (*Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 67 [82 Cal.Rptr.2d 442].)

### 3. *Application*

In its opening brief, Meisenheimer fails to provide a *single* record citation demonstrating that it raised in the trial court any of the numerous contentions outlined in part III.B.1., *ante.* In its reply brief, Meisenheimer states in a footnote that it made the argument pertaining to rule 3-310(F) of the State Bar Rules of Professional Conduct in its trial brief. We have determined that Meisenheimer did reference several of the contentions outlined in part III.B.1., *ante,* in its trial brief. However, Meisenheimer does not indicate in any of its briefing in this court whether Dietz opposed such contentions (and if so, how), nor the manner by which the trial court may have ultimately resolved the issues.

This court has no obligation to cull the lengthy record, ascertain the procedural context in which Meisenheimer may have raised these claims in the trial court, determine whether and how Dietz opposed the claims,

determine whether Meisenheimer's contentions were ever addressed (and if so, whether by the trial court or the jury), and, thereafter, employ the proper standard of review in resolving such claims. (See *In re S.C., supra,* 138 Cal.App.4th at pp. 406–407 [appellant must demonstrate that it properly preserved appellate claims in trial court]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 [35 Cal.Rptr.2d 574] ["We are not required to search the record to ascertain whether it contains support for [appellant]'s contentions."]; accord, *Benach, supra,* 149 Cal.App.4th at p. 852 [stating that is not the role of an appellate court to construct legal theories to defeat the presumption of correctness of a judgment].) Accordingly, we conclude that Meisenheimer has failed to demonstrate that it properly preserved any of the appellate contentions outlined in part III.B.1., *ante.*

Meisenheimer also fails to provide any argument in its opening brief as to why this court should consider these arguments for the first time on appeal. In its *reply* brief, Meisenheimer states that the applicable standard of review with respect to the issues outlined in part III.B.1., *ante,* is de novo and asserts that all of its contentions raise "pure questions of law that can be decided on undisputed facts." We question whether these contentions all truly present pure questions of law. To take just one example, Meisenheimer argues in its reply brief that "Dietz did not establish" that he complied with rule 2-200 of the State Bar Rules of Professional Conduct.[18] (Boldface, italics and some capitalization omitted.) Meisenheimer thus appears to acknowledge that this claim rests on the *evidence* presented (or not presented) at trial. However, we need not definitively resolve whether Meisenheimer's claims present "pure questions of law," because Meisenheimer's bare assertion that this is so in its reply brief does not save the claims from forfeiture. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364] [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before . . ." ' "].)

Accordingly, we conclude that Meisenheimer has forfeited the contentions outlined in part III.B.1., *ante.*

---

[18] The unenforceability of a contract due to noncompliance with rule 2-200 of the State Bar Rules of Professional Conduct is a *defense* to a breach of contract cause of action. (*Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 901 [102 Cal.Rptr.2d 502].) Thus, it would appear that it was *Meisenheimer's*, rather than *Dietz's*, burden to establish that the referral-fee contract was unenforceable. We do not resolve this issue on the merits, but rather, provide this example to demonstrate that the requirement that an appellant present an accurate procedural history of the issues it presents on appeal is essential for a fair resolution of such issues by this court.

## IV.

## DISPOSITION

The judgment is affirmed. Dietz is entitled to costs on appeal.

McConnell, P. J., and O'Rourke, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 17, 2009, S177445.