Filed 6/28/13  Snyder v. Shoen CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **ROBERT A. SNYDER et al.,**<br><br>　　　**Plaintiffs and Respondents,**<br><br>**v.**<br><br>**PAUL F. SHOEN,**<br><br>　　　**Defendant and Appellant.** | **A133083**<br><br>**(Humboldt County<br>Super. Ct. No. DR081047**) |

Paul F. Shoen appeals from a judgment granting Robert A. Snyder and Brenda Ford (respondents) a prescriptive easement over an eight-by-forty foot section of Shoen's property (the Easement Area).  After a trial, the superior court ruled that respondents and their predecessors in interest had used the Easement Area for decades to obtain vehicular access to the garage located on what is now respondents' property.  Finding that respondents had proved all the elements of a prescriptive easement by clear and convincing evidence, the trial court entered judgment in their favor.

In this court, Shoen attacks the judgment as unsupported by substantial evidence. He also contests the adequacy of the statement of decision and judgment and raises objections to the procedures used by the trial court to define the precise dimensions of the Easement Area.  We find none of Shoen's arguments persuasive.  Accordingly, we will affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Where the losing party in the trial court challenges a judgment as lacking substantial evidence to support it, "'we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact.'" (*Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445, 449 (*Felgenhauer*).) This standard of review affects our statement of the facts, and accordingly "we recite the facts in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 747.)

*The Parties' Properties*

In November 1991, respondents, a married couple, bought property located at 1229 Williams Street in Eureka, California (the Snyder/Ford Property). They purchased the property from Scott and Beverly Erwin, who had lived there from 1981 to 1990, first as tenants and then as owners. The Snyder/Ford Property is improved with a single family house and a detached, one-car garage. The house has been respondents' exclusive residence since 1991. It was built in either 1912 or 1913, and the current garage has existed since approximately the 1950s.

Respondents' house faces Williams Street on the west, and on the northern side of the Snyder/Ford Property is a paved public road called South Hillsdale Street. The eastern boundary of the property is fronted by a 12-foot public alley belonging to the City of Eureka (the City). The northern entrance to the alleyway is on South Hillsdale Street. Respondents' garage opens onto the alley, and the garage provides the only off-street parking on the Snyder/Ford Property. The only vehicular access to the garage is from the alley.

To the east of the Snyder/Ford Property on the opposite side of the alley is a parcel of commercial real estate Shoen purchased in December 1985 (the Shoen Property).[1]  The building on the Shoen Property is a former carriage house now used for garage port storage.  The structure has eight garage ports that exit onto the public alley separating the Shoen Property from the Snyder/Ford Property.  There is a narrow concrete strip in front of the garage port doors where they open onto the alley.

*The Erwins' and Respondents' Uses of the Garage, Alley, and Easement Area*

When the Erwins lived at what is now the Snyder/Ford Property, they regularly used the garage, always accessing it from the alley off of South Hillsdale Street.  The Erwins parked their car in the garage on a daily basis and did so for the entire time they lived there.  They would go in and out of the garage at least a couple times a day.  They also used the garage for storage and for unloading things such as firewood and camping equipment.

Scott Erwin testified at trial, and he explained that in the mid-1980s, he planted a tree behind a utility pole that stood at the alley entrance.  When he planted the tree, it did not interfere with the roadbed or vehicular traffic at the alley entrance because the western edge of the roadbed was located about eight feet to the east of the tree and the utility pole.

At trial, Erwin was shown a photograph of the alley area taken in either 2003 or 2004.  He stated that the western edge of the alley roadbed pictured in the photograph was in the same approximate location as it had been during the time he had owned the Snyder/Ford Property.  The western edge of the roadbed was about 10 feet east of the garage entry.  Erwin testified that to enter the garage, the driver's side of his car would have to come within one or two feet of a concrete strip in front of the storage building on the Shoen Property.  Shown another photograph of the alley area that depicted a pole Shoen later erected at the western boundary of his property, Erwin testified that he historically drove over a portion of the Shoen Property when he parked his car in the

---

[1] Shoen later deeded the property to the Paul F. Shoen Revocable Trust, for which he serves as trustee.

3

garage. The Erwins never asked permission to drive on this area, and during the time they lived at what is now the Snyder/Ford Property, no one ever complained about their use of it.

Since they bought their current residence, respondents have made a number of different uses of the garage. They have used it to move materials in and out of the house, because the garage provides the only reasonable means of access. To do so, Snyder would turn onto the alley roadway, the western edge of which was about 10 feet from his garage. He would then pull up over the eastern edge of the roadway and back his vehicle into the garage.[2] In addition to using the garage to transport materials in and out of their house, respondents also used it to store recycling and garbage, which they would then load into their vehicle for transport to the recycling center and the dump. They also moved firewood and materials for woodworking, carpentry, and landscaping into and out of the garage using their vehicle.

Respondents also used the garage to store their pickup truck for a brief period, and from 1991 until about 2001, they regularly pulled their cars into the garage so that Snyder could change the oil. Starting in 2007, they regularly parked their BMW sedan in the garage.

Snyder estimated that from 1991 to 2007, he and his wife would access the garage with their vehicle three to four times per week "in peak use times" and "nonpeak times . . . probably about once a week[.]" During the summer when Snyder was off of work, respondents would use the garage access several times a day "five, six, seven days a week[.]" Between 2000 and 2007, Snyder "would use the historic roadway . . . ten feet from the edge of [his] garage" to gain access. "[T]he historic roadway is somewhere around ten feet wide," and Snyder would use that area to enter his garage. If he backed the car into the garage, he "might use a little bit more of the property, not a lot."

At trial, Snyder was shown a series of photographs depicting the alley area and the entrance to his garage. Among other things, the photographs depicted respondents'

---

[2] Respondents owned a number of different automobiles during the time relevant to this suit, including a Ford pickup truck, two Volkswagen Vanagons, and a BMW sedan.

4

Volkswagen Vanagon positioned in front of their garage in the place it would be when Snyder used it to unload materials into the garage. Referring to the photographs, Snyder testified that in this position, part of his Vanagon was in the travelled roadway. The western edge of the travelled roadway was approximately 10 feet from the edge of respondents' garage.

In certain photographs, Ford is pointing to the boundary line between the Shoen Property and the public alley, and Snyder testified that the western edge of the travelled roadway corresponded closely to the western edge of the Shoen Property. This is visible in a number of the photographs, in which the boundaries of the Shoen Property are marked in hot pink paint on the ground. These photographs show a gravel roadway that is almost entirely encompassed within the marked boundaries of the Shoen Property. Other photographs show, as Snyder testified, that it is not possible for respondents to exit their garage with either their van or their sedan without crossing the survey line onto the Shoen Property.

Snyder gave an estimate of the size of the area of the Shoen Property over which respondents regularly travelled with their vehicles from 1991 until after Christmas in 2007. He said the Easement Area is approximately eight feet wide and 40 feet long. Snyder's estimate was based on the location of the edge of the travelled way, and he testified that "the western edge of the travelled way was at most about two feet on city property. So the rest of the road was on Mr. Shoen's property, a road is about ten feet wide. My vehicle is seven feet wide, you drive down the middle, you have to have some room on both sides there." Snyder identified this area as marked on a surveyor's map that was introduced in evidence at trial.

Like the Erwins before them, respondents have never asked anyone for permission to drive on the Easement Area, which they used to access their garage. Until 2006, no one had ever complained to respondents about their use of the Easement Area. In fact, Snyder believed the public right-of-way was the traveled way that he had regularly used for years.

5

*The Survey of the Shoen Property*

In October 2005, Shoen retained Michael David Pulley, a licensed surveyor, to survey the Shoen Property. Shoen engaged Pulley because of concerns that there were unauthorized uses of the Shoen Property and "possibly encroachments into the alleyway that made it so that people couldn't use what was actually the legal alleyway." Prior to the survey, neither Snyder nor Shoen knew the exact location of the line between the Shoen Property and the City's public alley.

Pulley's survey showed that the eastern edge of respondents' garage is actually located on the western line of the City's 12-foot alley. His survey also documented the "Edge of Travelled Way," or the "area being traveled on by vehicles." At the time of the survey, the travelled way was an area of cleared gravel that Pulley estimated to be 16 to 18 feet wide, extending from an area of vegetation on its western side eastward to the concrete strip in front of the garage ports on the Shoen Property.[3] According to Pulley, "[t]he westerly edge of the traveled way would be two feet westerly of the north westerly corner of the Shoen [P]roperty." He noted that the edge of the travelled way did not match the City-owned alleyway, and one of the reasons he was asked to perform the survey was to determine the relationship between the travelled way and the actual boundaries of the alley.

Pulley also surveyed the location of the utility pole and the tree Erwin had planted at the corner of the alley and South Hillsdale Street. He did this because Shoen's property manager had expressed concern that the pole and tree might be encroaching into the alley.

*The Dispute Between the Parties*

In January 2007, Shoen's property manager complained to the City because the utility pole and the tree were pushing vehicular traffic onto the Shoen Property. Shoen was aware that complaints were made on his behalf, and he acknowledged that the utility pole and tree were forcing traffic in the direction of his property.

---

[3] At a point past the Snyder/Ford Property, the travelled way narrowed to about 10 feet in width as it passed a two-story structure on the Shoen Property.

6

On December 26, 2007, Shoen erected a steel pole and cable that blocked the South Hillsdale Street entrance to the alley.[4] He did so without prior notice to respondents.

On March 17, 2008, Shoen's attorney sent respondents a letter purporting to grant them "permission to enter upon the property of Shoen for the purpose of vehicle access to their garage." The letter noted that Shoen's permission "may be revocable at any time." On October 9, 2008, Shoen caused a Civil Code section 813 notice to be recorded in the Official Records of Humboldt County.[5] This was the first time Shoen recorded such a notice for his property. The purpose of the notice was "to record the fact that use of [the Shoen Property] is by permission only."

*The Action Below*

Respondents filed a complaint in Humboldt County Superior Court on November 12, 2008.[6] In addition to other claims, their complaint alleged they had acquired a private easement by prescription over a portion of the Shoen Property.

---

[4] In January 2008, the City began work that cleared the alley right-of-way, moved the utility pole, and resurfaced the alley roadbed. Before this work was done, most of the area within the alley right-of-way in front of respondents' garage was not passable by car because of the presence of the utility pole, the tree, a garden area, and respondents' compost bin.

[5] Civil Code section 813 provides in relevant part: "The holder of record title to land may record in the office of the recorder of any county in which any part of the land is situated, a description of said land and a notice reading substantially as follows: 'The right of the public or any person to make any use whatsoever of the above described land or any portion thereof (other than any use expressly allowed by a written or recorded map, agreement, deed or dedication) is by permission, and subject to control, of owner: Section 813, Civil Code.' [¶] The recorded notice is conclusive evidence that subsequent use of the land during the time such notice is in effect by the public or any user for any purpose (other than any use expressly allowed by a written or recorded map, agreement, deed or dedication) is permissive and with consent in any judicial proceeding involving the issue as to whether all or any portion of such land has been dedicated to public use or whether any user has a prescriptive right in such land or any portion thereof. . . . [¶] [¶] The recording of a notice pursuant to this section shall not be deemed to affect rights vested at the time of recording."

[6] It appears that Shoen initially removed the case to the United States District Court for the Northern District of California. He filed an answer and counterclaims in that court.

7

The matter was tried to the court over three days beginning on November 29, 2010. After the conclusion of the trial, the parties submitted briefs on the issues. On February 1, 2011, the court filed a "Memorandum of Decision" finding that respondents had proved all the elements of a prescriptive easement. It ordered Shoen to remove the pole and cable. It ruled that "[t]he extent of the easement shall be such as to allow use of the previous travelled way so as to allow vehicular access to [respondents'] garage." The court ordered counsel to confer "regarding the exact dimensions" of the easement and noted they could request a hearing on the issue if they were unable to agree.

On February 16, 2011, Shoen filed a request for statement of decision. It asked the court to specify the "factual and legal" basis for its decision on 13 different issues. For the most part, the request asked the court to explain the basis for its conclusion that respondents had proved all of the elements necessary to establish a prescriptive easement.

The parties were unable to agree on the dimensions of the easement, and respondents' counsel requested a hearing on the matter. On April 15, 2011, the court held a brief hearing and ordered the parties to submit briefs on the scope of the easement. In his brief on this issue, Shoen argued that respondents had not established a prescriptive easement and were not entitled to an easement of any scope. Respondents argued that the easement should encompass an area of eight feet by 40 feet. They described the area covered by the easement in their supplemental posttrial brief, and the area is shown marked on a surveyor's map they attached as exhibit A.

On May 2, 2011, the trial court filed a "Ruling Re: Scope of Easement and Statement of Decision." It found the Easement Area "to be eight feet by forty feet, as set forth in exhibit A" attached to respondents' supplemental posttrial brief. It allowed Shoen's request for a statement of decision and directed respondents' counsel "to submit a proposed Statement of Decision on all issues raised in [Shoen's] request, as well as the scope of the easement." Respondents submitted a proposed judgment and statement of decision. Shoen filed objections to both.

---

The parties' briefs tell us that the federal district court later remanded the case to the Humboldt County Superior Court.

8

On June 27, 2011, the trial court filed its statement of decision and judgment. The statement of decision addressed each of Shoen's 13 requests, specifically discussing the testimony and documentary evidence upon which the court relied and citing case law relevant to the court's decision. The judgment granted respondents "[a] prescriptive easement for vehicular ingress and egress over a rectangular portion of the existing roadbed on the Shoen Parcel measuring 8 feet in width and 40 feet in length, described as follows: commencing at the northwest property corner of the Shoen Parcel (where the steel pole was constructed by Shoen), proceeding in a southerly direction along the westernmost boundary of the Shoen Parcel a distance of 40 feet, then east a distance of 8 feet, then north a distance of approximately 40 feet (parallel to the westernmost boundary of the Shoen Parcel) to the intersection of the northernmost boundary of the Shoen Parcel, then west a distance of approximately 8 feet to the point of beginning (the "Easement Area"). [¶] For illustration purposes, a copy of a survey diagram depicting the Easement Area described above is attached hereto as **Exhibit A**." The Easement Area is clearly shown in the attached exhibit.

Shoen filed a notice of appeal on August 26, 2011.

DISCUSSION

While Shoen's lengthy opening brief raises a plethora of arguments,[7] the basic thrust of his contentions is that the trial court's findings on the elements of a prescriptive

---

[7] Shoen's opening brief aptly illustrates the Fourth District's observation that "the extra length of the 'briefs' in appellate and reviewing courts is not always a good thing[.]" (*In re Marriage of Shaban* (2001) 88 Cal.App.4th 398, 409.) A 109-page tome containing almost 30,000 words, appellant's opening "brief" takes over 40 pages to recite the facts. Shoen's counsel then embark on a legal discussion taking us from the political theory of John Locke to the origins of easements at English common law, in the course of which we are taught the meaning of such ponderous Latin phrases as *adeo lutosa et funderosa* and offered the views of Lords Mansfield, Ellenborough, and Coke. Counsel trace the origins of equity as far back as ancient Rome and through the reign of King Edward III. The brief quotes and refers to the writings of Lewis Carroll and John Milton, and before it reaches its end, we even learn the history of Thomas Hobson and his infamous "Hobson's choice." While the brief displays counsel's erudition, we question whether

9

easement are unsupported by substantial evidence. He also contends the statement of decision and judgment are ambiguous and contradictory. He further objects to the posttrial procedure the trial court used to define the precise scope of the Easement Area. We will address these arguments in the order presented.

I.      *Governing Law and Standard of Review*

"The elements necessary to establish a prescriptive easement are well settled. The party claiming such an easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years. [Citations.] Whether the elements of prescription are established is a question of fact for the trial court [citation], and the findings of the court will not be disturbed where there is substantial evidence to support them." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570 (*Warsaw*).)

In the trial court, the elements of a prescriptive easement must be established by clear and convincing evidence, but "'if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.'" (*Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1162, quoting *Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708 (*Applegate*).) In this court, "[t]he usual rule of conflicting evidence is applied, giving full effect to respondents' evidence, however slight, and disregarding appellant's evidence, however strong." (*Ibid*.) "'Where the trial court . . . has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony. [Citation.]'" (*Felgenhauer, supra,* 121 Cal.App.4th at p. 449.) The same substantial evidence standard of review applies where, as here, the trial court's findings of fact are embodied in a statement of decision. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.)

"A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. A trial court is

such an exhaustive treatment is helpful in a case in which appellant essentially challenges the sufficiency of the evidence.

10

not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence. Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result. . . . In issuing a statement of decision, the trial court need not address each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request. [Citation.]" (*Nunes Turfgrass, Inc. v. Vaughn-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 (*Nunes Turfgrass*).)

The statement of decision is required to resolve all material issues of fact, not law. (*Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140, 163.) It need only set out the trial court's ultimate findings, rather than its evidentiary ones. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 (*Yield Dynamics*).) An ultimate fact is "a core fact, such as an element of a claim or defense, without which the claim or defense must fail." (*Ibid*.)

If the trial court's statement of decision is ambiguous or omits material factual findings, the doctrine of implied findings generally requires us to infer any factual findings necessary to support the judgment. (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) To avoid the doctrine's application, an appellant must take two steps in the trial court. First, the appellant must secure a statement of decision under Code of Civil Procedure section 632, and second, pursuant to Code of Civil Procedure section 634, the appellant must bring any alleged ambiguities and omissions in the statement of decision to the trial court's attention. (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 58.) If the appellant fails to take these steps, then the doctrine of implied findings will apply, and we will infer the trial court made implied findings favorable to the prevailing party on all issues necessary to support the judgment. (*Id*. at pp. 59-60.) In such a case, we review the implied factual findings under the substantial evidence standard. (*Id*. at p. 60.)

11

II.     *The Clear and Convincing Evidence Burden of Proof Does Not Change the Standard of Review.*

Shoen first argues that respondents failed to prove their case by clear and convincing evidence. "That standard was adopted, however, for the edification and guidance of the trial court, and was not intended as a standard for appellate review." (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750.) Thus, "to the extent [Shoen] means to say we must find more substantial evidence to support the trial court's finding . . . than we would if the burden of proof had been only a preponderance of the evidence, he is mistaken. Our review is the same regardless of the burden of proof at trial." (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 604.) As explained above, if substantial evidence exists to support the trial court's conclusions, they are not open to review on appeal. (*Applegate, supra,* 146 Cal.App.3d at p. 708.)

Under this argument heading, Shoen contends the trial court's statement of decision establishes that the court was not convinced. This argument is premised on the notion that the statement of decision is somehow ambiguous with respect to either the dimensions of the Easement Area or the path used by respondents and their predecessors in interest. We find no such ambiguity. In its May 2, 2011 ruling on the scope of the easement, the trial court found "the easement to be eight feet by forty feet, as set forth in exhibit A attached to [respondents'] Supplemental Post-Trial Brief re: Prescriptive Easement Dimensions." That exhibit, which was Pulley's survey map of the area, clearly shows the edge of the travelled way and is cited in the statement of decision as part of the court's discussion of the location of the path used by respondents and the Erwins.

Shoen also quibbles with the trial court's language. He appears to argue that there is some material difference between the "old road," the "gravel route," and the "dirt route," and claims there are "three different routes." This portion of his brief contains no citations to the record that would support the latter claim, however, and we are not obligated to search his 40-page statement of facts to determine whether the record contains any such evidence. (See *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 96-97, fn. 2 ["Each and every statement in a brief regarding matters that are in the record on

12

appeal, whether factual or procedural, must be supported by a citation to the record. This rule applies regardless of where the reference occurs in the brief."].) In any event, the trial court was obligated to set out only its *ultimate* findings in the statement of decision; it was not required to set forth its *evidentiary* ones. (*Yield Dynamics, supra,* 154 Cal.App.4th at p. 559.) Shoen's demand that the court set out the "factual and legal basis" for the line of travel "is wholly beyond the scope of the statutory procedure and warranted no response at all." (*Ibid.*)

Moreover, it is well established that minor deviations in the line of travel will not defeat a prescriptive easement. (*Warsaw, supra,* 35 Cal.3d at p. 571.) In *Warsaw,* the Supreme Court affirmed the trial court's finding that the plaintiffs had acquired a prescriptive easement over a strip of the defendant's property that abutted the plaintiffs' loading docks, because the strip was used by the drivers of large trucks when making deliveries to the plaintiffs' building. (*Id.* at p. 570.) As our high court explained, "The evidence revealed that truck drivers who were making deliveries to or receiving goods from plaintiffs used the parcel to approach the building, swing around and back into plaintiffs' loading dock. Since the drivers varied in their abilities, *the space required to complete this maneuver was variable. No two drivers followed precisely the same course,* but all used the parcel for the same purpose—to turn their vehicles so they could enter plaintiffs' loading docks. There was substantial evidence to support the findings on this issue." (*Id.* at p. 571, italics added.) Thus, it does not matter if respondents and the Erwins used a slightly different path over the Shoen Property. (*Ibid.*; accord, *Guerra v. Packard* (1965) 236 Cal.App.2d 272, 283-284, 293 [evidence supported finding there was no substantial change in easement road, although witnesses testified that certain stretches of road deviated from original trail by 150 feet to one half mile].) Like the truck drivers in *Warsaw,* they all used the Easement Area for the same purpose, which was to access the garage.[8]

---

[8] Contrary to Shoen's contentions, this case bears no resemblance to *Matthiessen v. Grand* (1928) 92 Cal.App. 504. There the court held there was insufficient proof of the easement route, "in view of the uncertainty of the location or course of this ancient trail

III.    *Respondents' and Their Predecessors' Use of the Shoen Property Was "Hostile."*

Shoen argues respondents' use of his property was not "hostile," and hostile use is necessary to establish a prescriptive easement. Under this argument heading, he groups a number of contentions, only some of which we need address.[9]

In this context, use of another's property is "hostile" when "'the owner has not expressly consented to it by lease or license or has not been led into acquiescing in it by the denial of adverse claim on the part of the possessor.'" (*Felgenhauer, supra,* 121 Cal.App.4th at p. 450, quoting 3 Casner, American Law of Property (1952) Title by Adverse Possession, § 5.4, p. 776.) As Justice Traynor put it, "The requirement of 'hostility' . . . [citation] means, not that the parties must have a dispute as to the title during the period of possession, but that the claimant's possession must be adverse to the record owner, 'unaccompanied by any recognition, express or inferable from the circumstances of the right in the latter.'" (*Sorensen v. Costa* (1948) 32 Cal.2d 453, 459, quoting 4 Tiffany, Real Property [3d ed.], 425.) The element of hostile possession may be established even when the claimant's occupancy and use occur by mistake. (*Gilardi v. Hallam* (1981) 30 Cal.3d 317, 322.)

---

10 miles in length, which meanders aimlessly through the midst of a large cattle ranch, running over hills and down dales, sometimes following a river canyon, clambering along an adjacent bluff or skirting across a convenient mesa, with no attempt to definitely describe its course by measurements or survey; with convincing evidence of numerous substantial changes in the course, in spite of the defendants' contradiction of these changes; with proof of continuous maintenance by the owner of locked gates across the way[.]" (*Id.* at pp. 509-510.) This description stands in stark contrast to the well defined and well documented line of travel in this case.

[9] Shoen first contends that, as a matter of law, respondents' use of the Easement Area was pursuant to a temporary personal right. He argues that respondents obstructed the alley, and this obstruction gave both respondents and the general public a temporary personal right to use the adjoining property. Counsel point to nothing in the record demonstrating that this argument was made below, and although we have thoroughly reviewed Shoen's objections to the statement of decision, we ourselves have found nothing that even resembles this argument. As the argument was not made below, we need not consider it. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 800-801 (*Dietz*) [reviewing court will not consider issue unless appellant demonstrates it was raised in court below].)

14

Shoen argues that respondents' use of his property was by permission. Both Erwin and Snyder testified at trial, however, that they never asked Shoen's permission to use the Easement Area. While Shoen refers us to a portion of Snyder's testimony on cross-examination, it does not support his argument. When Snyder was asked if he "would pull [his] Vanagon right up to Mr. Shoen's garages," he responded, "I believe I testified that I pulled up within four feet of Mr. Shoen's garages, *and I thought that use was acceptable and did not need permission*." (Italics added.) Far from demonstrating that respondents' use was permissive, this testimony directly undermines any such claim. (See *Felgenhauer, supra,* 121 Cal.App.4th at p. 450 [where claimant testified he had no discussion with bank about deliveries being made over bank's property, jury could conclude claimant used property without bank's permission].)

Shoen argues there is no conflict in the evidence, which he claims shows that respondents' use was permissive and was "understood to be permissive." Again, however, this section of his brief is devoid of citations to any actual evidence in the record. He cites only to the statement of decision and asserts that it is unsupported by the evidence. An appellant's factual assertions cannot rest solely on matters appearing in the statement of decision, because " '[i]t is the evidence supporting or opposing the trial court's decision that is important.' " (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149, quoting *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379.) Shoen also faults the statement of decision for its "failure to point to supporting facts[.]" But as explained above, "[a] trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence." (*Nunes Turfgrass, supra,* 200 Cal.App.3d at p. 1525.)

Substantial evidence supports the trial court's finding that respondents' use of the Shoen Property was hostile. Neither the Erwins nor respondents ever spoke to Shoen about using the Easement Area to gain access to the garage on the Snyder/Ford Property.

15

Their testimony is sufficient to sustain the trial court's finding on this issue.[10] (*Aaron v. Dunham* (2006) 137 Cal.App.4th 1244, 1252-1253.)

IV.     *There Is Substantial Evidence of Exclusive Use.*

Shoen next argues that respondents' use of the Shoen Property was not exclusive. Initially, we question whether this argument is properly before us, because it does not appear it was made below. Shoen does not cite to a request for a specific finding on the issue of exclusivity, and he did not call the trial court's attention to any lack of findings on this issue in his objections to its statement of decision.[11] Thus, even if we assume that a specific finding on this issue was required, Shoen's failure to bring the matter to the trial court's attention means that we must imply any findings necessary to support the judgment. (*Fladeboe*, *supra*, 150 Cal.App.4th at pp. 59-60.)

In any event, there is ample evidence to support a finding of exclusive use. " 'The term "exclusive," . . . does not mean that the easement must be used by one person only, but simply that the right shall not depend for its enjoyment on a similar right in others; it must be exclusive as against the community or public at large. The use may be exclusive in the required sense even though it is participated in by the owner of the servient tenement, or by the owners of adjoining land.' " (*Marangi v. Domenici* (1958) 161 Cal.App.2d 552, 556-557.) Shoen does not appear to claim that respondents' right was dependent upon the right of others, and the evidence supports a finding that their use was individual and not as members of the general public. (*Applegate, supra,* 146 Cal.App.3d at p. 710.) Snyder testified that respondents used the Easement Area over the years for

---

[10] Shoen's reliance on cases such as *Case v. Uridge* (1960) 180 Cal.App.2d 1 is mistaken. There, after noting that the evidence regarding use of the disputed area was "a mass of confusion" (*id.* at p. 6), the appellate court sustained the trial court's finding that the claimant had failed to meet his burden of proof. (*Id.* at p. 9 ["it may be that the trial court could have come to a contrary conclusion than here reached, but it was not required to do so as a matter of law under the evidence here presented"].) Like the court in *Case v. Uridge,* we must defer to the trial court's factual findings.

[11] Shoen claims the ambiguity was brought to the trial court's attention in his objections, "such as Objection No. 2." We disagree. In that objection, Shoen complained that the trial court used "not less than twenty-five different vague terms to describe some or all of the disputed area[.]" This objection does not even mention the issue of exclusivity.

16

many different purposes, including the loading and unloading of materials and the storage and removal of garbage and recycling. In addition, when respondents remodeled their home, contractors they hired also used the Easement Area, as did the contractors' suppliers. This is sufficient to support a finding of exclusive use. (*Id.* at pp. 709, 710 [roadway used by family, guests, and business invitees; moving of large mobilehomes on and off property demonstrated right was based on individual use].)

In this portion of his brief, Shoen raises yet another argument he failed to make below. He contends there can have been no exclusive use because respondents failed to repudiate their "non-adverse rights[.]" The precise nature of these alleged non-adverse rights is not explained, and the argument is forfeited because it was not made in the trial court. (*Dietz, supra,* 177 Cal.App.4th at pp. 800-801.)

Even if the argument had been preserved, it would fail because the cases Shoen cites to support it are entirely inapposite. Shoen's counsel fail to explain that in two of those cases, there was a prior contract granting the easement claimants the right to use the disputed property, and since those rights had originally been granted by express permission, the use was presumed to be permissive until permission was repudiated by the user. (*Beagle v. Hanks* (1954) 125 Cal.App.2d 298, 299-300; *Brandon v. Umpqua Lumber Etc. Co.* (1914) 26 Cal.App. 96, 98.) That is clearly not the case here. In *Hare v. Craig* (1929) 206 Cal. 753, the court simply held that the evidence would not support a finding of a prescriptive easement, since it appeared that the area in question had already long been used as a public road by the time plaintiff Hare purchased the lot adjoining it. (*Id.* at p. 757.)

We therefore reject Shoen's argument that there is insufficient evidence of respondents' exclusive use.

V. *There Is Substantial Evidence that Respondents Used the Easement Area for the Requisite Five-Year Period.*

Shoen challenges the trial court's conclusion that respondents used the Easement Area for the statutory period of five years. (See Code Civ. Proc., § 321.) As we explain, none of the various arguments Shoen groups under this heading is persuasive.

17

A.    *We Defer to the Trial Court's Interpretation of the Photographic Evidence.*

Shoen first contends that the photographic exhibits introduced below are writings within the meaning of Evidence Code section 250, and their interpretation is therefore a pure a question of law. While photographs are writings, Shoen cites no case for the proposition that we may review photographic evidence de novo and substitute our conclusions about what it shows for those of the trial court. (Cf. *People v. Bamberg* (2009) 175 Cal.App.4th 618, 630, fn. 5 ["The *trier of fact* may consider the weight to be given to physical evidence such as photographs, and it may take into account whether photographs accurately portray what they are claimed to depict." (Italics added.)].) Here, the photographs created—at most—a conflict in the evidence. In such circumstances, it is the factfinder's task "to reconcile that conflict if possible, or to determine the weight and sufficiency of the evidence in that regard." (*Harmon v. San Joaquin L. & P. Corp.* (1940) 37 Cal.App.2d 169, 173.)

B.    *Substantial Evidence Supports the Trial Court's Findings on the Line of Travel.*

Shoen next refers us to some of the photographic exhibits that were introduced by stipulation at trial. He claims they show that what he calls the "dirt route" and the "gravel route" were in two different places. It is sufficient for us to note that there was testimony about what these particular photographs depicted, as well as other testimony and exhibits about the location of the line of travel and the Easement Area. Both Erwin and Snyder testified that the western edge of the travelled way was about 10 feet to the east of respondents' garage. Snyder testified that the photos to which Shoen refers in his brief showed that the edge of the travelled way was located in the same place in 2003 or 2004 as when respondents purchased their property in 1991. The evidence contradicts Shoen's claim that the "dirt route" and the "gravel route" were in two different places.[12]

---

[12] This also disposes of Shoen's argument that any easements established before 2004 were eliminated through nonuse. This argument is premised on the contention that the "dirt route" was materially different from the "gravel route," a contention that finds no support in the evidence. Equally unavailing is Shoen's argument that any easement the Erwins gained was extinguished sometime after 1990 because respondents did not

C.   *The Judgment Precisely Describes the Easement Area.*

Shoen then repeats his claim that the trial court's description of the Easement Area is "unacceptably contradictory and vague." A similar contention was rejected in *Bartholomew v. Staheli* (1948) 86 Cal.App.2d 844. There, the appellate court held the trial court's findings sufficiently described a prescriptive easement because they referred to the supplemental complaint and a surveyor's diagram that had been submitted as an exhibit. (*Id*. at p. 853.) In this case, both the statement of decision and the judgment contain a precise description of the Easement Area. In addition, both the statement of decision and the judgment refer to an attached copy of Pulley's survey diagram on which the Easement Area is marked. The trial court's written description of the Easement Area and the attached survey diagram are more than sufficient to identify the easement's location. (*Ibid*.)

VI.   *The Evidence Shows Shoen Had Notice of the Use of the Easement Area.*

Shoen contends there is no evidence he knew of respondents' use of the Easement Area and nothing about that use that would have conveyed its hostile character. Notice to Shoen can be implied or inferred, however, from respondents' visible, open, and notorious use. (*Applegate, supra,* 146 Cal.App.3d at p. 709; 6 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 15:34, p. 15-131 ["the adequate open, visible, and notorious use of the property raises an inference that the owner has either actual or constructive notice of the use"].) In this case, there was evidence showing that both the Erwins and respondents used the Easement Area continuously for years to gain access to the garage on the Snyder/Ford Property. This open and visible conduct was sufficient to charge Shoen with knowledge of the manner in which the Easement Area was being used. (*Wallace v. Whitmore* (1941) 47 Cal.App.2d 369, 372.)

---

continue the Erwins' practice of parking their car in the garage on a daily basis, but rather only used the easement occasionally for vehicular access to their garage. (See *Fobbs v. Smith* (1962) 202 Cal.App.2d 209, 213 ["an omission to use the driveway when not needed does not disprove continuity of use shown by using it when needed"].)

VII.  *Substantial Evidence Supports the Scope of Use Granted by the Judgment.*

Shoen next argues there is no evidence to support the scope of use in the judgment.  He claims the evidence does not support giving respondents unlimited ingress and egress to their garage.  He contends the judgment somehow enlarges the historical uses of the Easement Area because it (1) "allowed the line of travel to change from the dirt route to the gravel route" and (2) allegedly permitted unlimited use of the Easement Area although respondents' prior use had only been occasional.  We disagree.

Initially, we observe that Shoen has forfeited this argument by failing to demonstrate he raised it in the court below.  (*Dietz, supra,* 177 Cal.App.4th at pp. 800-801.)  It is counsel's duty to cite to the portion of the record showing that the argument was made in the trial court, and if counsel fail to do so, we may disregard the contention.  (See *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 788.)  Nevertheless, even if this argument had been preserved, it would fail.

Shoen argues respondents failed to prove whether and how frequently they used the Shoen Property.  This argument simply ignores the evidence produced in the court below.  Snyder gave clear testimony on this issue.  He was asked to give "an estimate as to the frequency with which [he] accessed [his] garage with [his] vehicle" and he responded by stating that "in peak use times, somewhere on average, three to four times a week. . . .  [O]n nonpeak times, I would say probably about once a week[.]"  Erwin testified that he and his wife parked their car in the garage "on a daily basis."  Both witnesses also testified that because of the location of the travelled way, they could only access the garage for these purposes by using the Easement Area.  Thus, contrary to Shoen's contention, the record contains sufficient evidence of both the manner and frequency of use of the Shoen Property.

Shoen's reliance on *Pipkin v. Der Torosian* (1973) 35 Cal.App.3d 722 is misplaced.  He claims the case stands for the proposition that the use of the dominant tenement is not relevant to defining the scope of the use permitted under a prescriptive easement.  In fact, the case plainly states that "the use made of the dominant tenement . . . [is] only one *relevant* factor to consider insofar as it affects the quantitative-qualitative

20

use of a prescriptive easement." (*Id*. at p. 727, italics added.) More generally, the case also refutes Shoen's claim that the uses of the Easement Area have varied too greatly over time to support the establishment of the easement. Quoting the Restatement of Property, the court explained, " 'Since no use can ever be exactly duplicated, some variation between the use by which a prescriptive easement was created and the uses made under it after its creation is inevitable.' " (*Id*. at p. 727, fn. 1, quoting Rest., Property (1944) § 478, com. a.) To the extent Shoen is concerned about possible impermissible increases in the burden on his property, that "'is a matter for future determination of a court when the particular acts are presented to it for determination.' [Citation.]"[13] (*Pipkin v. Der Torosian, supra,* 35 Cal.App.3d at p. 729, quoting *Sufficool v. Duncan* (1960) 187 Cal.App.2d 544, 550.)

VIII.   *The Judgment Is Not Vague.*

Next, Shoen raises yet another claim of ambiguity, contending the judgment is impermissibly vague and that it goes beyond the scope of the pleadings. This argument borders on the frivolous. For example, Shoen asserts that "the easement is so vaguely defined it could be almost anywhere and any size." We will simply contrast this assertion with the description of the Easement Area in paragraph 2 of the judgment, which grants respondents "[a] prescriptive easement for vehicular ingress and egress over a rectangular portion of the existing roadbed on the Shoen Parcel measuring 8 feet in width and 40 feet

---

[13] Shoen contends the judgment describes a forbidden floating easement because it does not confine respondents to any identifiable route. Once again, Shoen chooses to ignore the very precise description of the Easement Area contained in the judgment and in the attached survey diagram. Moreover, the only case Shoen cites for this contention, *Hannah v. Pogue* (1944) 23 Cal.2d 849, is in no way similar to this one. In that case, the defendants sought to change the site of a dam and a ditch located on the plaintiff's land. (*Id*. at p. 854.) Because the site of the new dam was located hundreds of feet away from the site on which the dam had previously existed, the court held defendants had shown no prescriptive right to make use of the new area. (*Id*. at p. 855.) To hold otherwise would have given defendants "a floating easement enabling them to maintain a dam wherever they chose along the length of the river on plaintiff's land[.]" (*Ibid*.) Here, in contrast, the Easement Area is confined to the portion of the Shoen Property historically used by respondents and their predecessors in interest.

in length, described as follows:  commencing at the northwest property corner of the Shoen Parcel (where the steel pole was constructed by Shoen), proceeding in a southerly direction along the westernmost boundary of the Shoen Parcel a distance of 40 feet, then east a distance of 8 feet, then north a distance of approximately 40 feet (parallel to the westernmost boundary of the Shoen Parcel) to the intersection of the northernmost boundary of the Shoen Parcel, then west a distance of approximately 8 feet to the point of beginning (the "Easement Area").  [¶] For illustration purposes, a copy of a survey diagram depicting the Easement Area described above is attached hereto as **Exhibit A**."  Given this description and the attached exhibit, it is unclear to us what Shoen could find unclear in the description.

Shoen also makes a cursory argument that the judgment is beyond the scope of the pleadings.  We need not consider this argument, because it is insufficiently articulated and unsupported by citation of authority.  (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [court will consider only "those arguments that are sufficiently developed to be cognizable"]; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826-827, fn. 1 [court may disregard appellant's legal arguments when unsupported by citation of authority].)  The argument is also inconsistent with established California precedent.  (*Applegate, supra,* 146 Cal.App.3d at p. 712 ["Contrary to appellants' assertion that respondents could gain no more than prayed for in their complaint . . . a court of equity is not limited in granting relief by demands and offers of parties themselves but may fashion a decree which will do justice to all parties"].)

IX.     *Respondents Did Not Obstruct the Alley.*

Shoen contends respondents cannot be permitted to benefit from what he terms their "wrongful acts."  He argues that respondents obstructed the alley by using it as "a dump site, a composting area and for gardening[.]"  Shoen tells us that respondents created obstructions in the alley that forced traffic onto his property, although he acknowledges respondents' claim that the alley was already obstructed when they arrived in 1991.  Shoen's concession that "[t]he evidence is in conflict on that point" is sufficient to require us to reject his argument, because we have no power to substitute our judgment

22

for that of the trial court. (E.g., *Warsaw, supra,* 35 Cal.3d at p. 570; *Felgenhauer, supra,* 121 Cal.App.4th at p. 449.) The trial court specifically resolved this issue in favor of respondents, finding that "at no time did any condition [Snyder] created (compost bin, etc.) encroach upon the historic travelled roadway at the alley" and that "[t]he PG&E utility pole at the alley entrance . . . always set the path of travel, not any actions by [respondents]." As even Shoen admits, there is evidence that supports those findings, and they must therefore be upheld.

We also reject Shoen's contention that the statement of decision does not address his defense of unclean hands. In his opening brief, Shoen's counsel claim, "Paragraph 13 of Mr. Shoen's Request for Statement of Decision asks the court to explain, in a statement of law and fact, why it did not apply the doctrine of unclean hands. *The court failed to respond*." (Italics added.) This argument flies in the face of the record. Not only did the trial court take seven paragraphs to respond to this request in its statement of decision, it did so under a boldface heading that quotes Shoen's request word-for-word. Thus, Shoen's contention is nothing but "an unsupportable exaggeration." (*In re S.C.* (2006) 138 Cal.App.4th 396, 413.) In fact, the trial court went above and beyond what it was required to do, because it was under no obligation to respond to each question in Shoen's request for statement of decision. (*Nunes Turfgrass, supra,* 200 Cal.App.3d at p. 1525.)

X.     *The Posttrial Procedure Was Not an Abuse of Discretion and Did Not Deprive Shoen of a Fair Trial.*

We also reject Shoen's claim that the procedure used to resolve the case was an abuse of the trial court's discretion and violated his right to a fair trial. In essence, Shoen's argument is that it was somehow improper for the trial court to ask the parties to confer about the precise dimensions of the Easement Area after the court found respondents had proved their claim of a prescriptive easement. He claims that "the court declared there was an easement but was unable to give its dimensions or state its scope. The only possible conclusion to be drawn from that is that [respondents] failed to meet the clear and convincing standard." From these premises, Shoen reasons that the court

23

"realized it could not decide those two vital issues" and thus "it had no discretion other than to enter judgment" in his favor. We cannot agree.

Shoen's argument is again contradicted by the record. In its February 1, 2011 memorandum of decision, the trial court expressly found that respondents had proved all the elements necessary to establish a prescriptive easement. In our view, the only possible conclusion to be drawn from these explicit findings is that the trial court was persuaded respondents had met the burden of proving these elements by clear and convincing evidence. The trial court's memorandum of decision also states that the easement "was on the travelled way established by photographic evidence." That the court gave the parties the opportunity to come to an agreement about the "exact dimensions" of the Easement Area does not mean the court was unable to state the scope of the Easement Area.

Furthermore, the posttrial briefing on the scope of the easement was necessary only because Shoen simply refused to accept the trial court's ruling. His posttrial memorandum on the scope of the easement attempted to reargue the case, contending that respondents were "not entitled to a prescriptive easement of *any* scope." (Italics added.) The trial court defined the Easement Area based solely on the evidence presented at trial; it took no additional evidence in connection with the posttrial briefing. We find no fault with the trial court's actions, and Shoen presents no relevant authority showing this posttrial procedure constituted a miscarriage of justice requiring reversal.[14] (See *Western Aggregates, Inc. v. County of Yuba, supra,* 101 Cal.App.4th at p. 311.)

Before leaving this issue, we wish to express our disapproval of the intemperate nature of Shoen's argument. He claims that "[w]ith the backing of all the state's machinery of justice, [his] adversaries, as de facto appointed judges, were allowed [to]

---

[14] Shoen also suggests it was somehow improper for the trial court to direct respondents' counsel to prepare a proposed statement of decision. We note that this procedure is specifically authorized by California Rules of Court, rule 3.1590(c)(3). In addition, the trial court is under no obligation to prepare its own statement of decision, and in practice, trial courts frequently direct parties to prepare proposed statements. (E.g., *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 310-311.)

24

enrich themselves at his expense." Such "unwarranted personal attacks on the character or motives of the opposing party . . . are inappropriate and may constitute misconduct." (*In re S.C., supra,* 138 Cal.App.4th at p. 412.)

XI.    *Shoen Forfeited the Indispensable Party Argument.*

Shoen makes a one-paragraph argument that the case should be dismissed because of the failure to join the City, which Shoen contends was an indispensable party.  (See Code Civ. Proc., § 389, subd. (a)(1).)  As respondents point out, however, Shoen failed to raise this issue in the trial court, and "a claim of error in failing to join such an absent party is not cognizable on appeal unless it is appropriately raised in the trial court or there is some compelling reason of equity or policy which warrants belated consideration." (*Jermstad v. McNelis* (1989) 210 Cal.App.3d 528, 538.)  No such compelling policy reasons exist here.  And even if we were to assume the City was an indispensable party to the action below, the failure to join it would not have deprived the trial court of the power to make a legally binding adjudication between the respondents and Shoen.  (*Golden Rain Foundation v. Franz* (2008) 163 Cal.App.4th 1141, 1155.)

XII.    *The Statement of Decision and Judgment Are Consistent.*

Shoen's final argument is that the statement of decision contradicts the judgment. He tells us that he cannot respond to the statement of decision point by point, because it would expand his already lengthy brief.  With that much, we can agree.  We reject the argument, however, because Shoen again fails to demonstrate that the issues raised in his brief were raised below.  (*Dietz, supra,* 177 Cal.App.4th at pp. 800-801.)

Even if these arguments were properly preserved, "appellants' contentions as to the findings appear to be hypertechnical." (*Medina v. Brown* (1959) 172 Cal.App.2d 208, 212.)  Shoen again repeats his argument that the "dirt route" somehow differs materially from the "gravel route" and from this attempts to create ambiguity and inconsistency where they do not exist.  In *Medina v. Brown*—also a prescriptive easement case—the court rejected a similar challenge to a trial court's findings.  There, the appellants complained that two sentences in a finding were inconsistent because one stated that the plaintiffs had " ' "*usually* cultivated the aforesaid 11 feet" ' " while the other stated

25

plaintiffs had " ' "*continuously* farmed the said strip of land[.]" ' " (*Ibid*.)  The court disagreed, holding "[t]here is no inconsistency in this finding when it is read as a whole, and so read it is fully supported by the evidence and supports the judgment."  (*Ibid*.)

That is precisely the case here.  There is thus no merit to Shoen's contention that the statement of decision contradicts the judgment.[15]

DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.

---

[15] In his opening brief, Shoen makes certain general policy arguments regarding the law of prescriptive easements.  He even questions whether such easements should exist at all. We have not discussed these arguments, because any change in the legal method for acquiring a prescriptive easement "clearly would be a matter for the Legislature." (*Warsaw, supra,* 35 Cal.3d at p. 575.)