Filed 9/30/16  P. v. Summers CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>KYLE TIMOTHY SUMMERS,<br><br>　　　Defendant and Appellant. | A144345<br><br>(Sonoma County<br>Super. Ct. No. SCR-645700) |


Defendant Kyle Timothy Summers appeals from the trial court's order revoking his probation.  He argues the trial court did not have sufficient evidence to find him in violation of his probation because the only evidence offered was inadmissible hearsay.  He argues the admission of the evidence violated his constitutional rights to confrontation, cross-examination, and due process.  We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In early June 2014, the trial court suspended execution of Summers's seven-year prison sentence and placed him on three years' probation.  As a condition of probation, Summers was to complete a residential drug rehabilitation program which he was not to leave without the prior written consent of the program director or probation department (probation).  The court ordered Summers to be released to the Jericho Project drug treatment program (Jericho) and advised him, "You may not leave the program without the permission of the Court or the probation office or Jericho Project."  Summers entered Jericho.  On June 27, 2014, the court summarily revoked Summers's probation.

1

After a number of continuances, the court held a probation revocation hearing on October 9, 2014.  The only witness was Sonoma County Probation Officer Kelly Dunaway, Summers's probation officer.  She was familiar with Jericho and its practices for communicating with probation.  She understood Jericho would contact probation if it discharged a probationer from its program early.  Probation relied on Jericho's updates for its reports and to know how a probationer was doing in treatment.

Dunaway testified she discovered Summers was no longer at Jericho on June 24 or 25, 2014 when "[Summers] called [Dunaway] to let [her] know that he'd been discharged from the program."  Summers told her he did not believe he was at fault for the discharge because "they had put their hands on him."  Dunaway could not recall the Jericho staffer he identified.  He also informed her he went back to Jericho to try to reenter the program.  After speaking with Summers, Dunaway telephoned Jericho because she had not yet received Summers's discharge summary, though she knew he was no longer there.  Dunaway spoke with Nick, a Jericho staffer she believed was the intake coordinator but whose last name she could not remember.  Nick provided Dunaway information about Summers's discharge and said Summers had to be escorted off the premises because he would not leave.  He also informed her Jericho had sent her the discharge summary letter, a copy of which Dunaway received by fax later that day and the original which she received in the mail several days later.

The one-page letter, dated June 23, 2014, and addressed to Dunaway from Jericho Community Director Damon Casparian, reported the following: "On 6/20/2014, Mr. Summers was discharged from the program due to his consistently argumentative, and confrontational behavior.  Shortly after Mr. Summers' [sic] was discharged he returned to our facility displaying aggressive behavior and had to be escorted off the premises by Jericho Staff.  Mr. Summers had been counseled on his aggressive and threatening behavior and was aware of the fact that behavior of this kind would result in his discharge from the program."

The defense questioned Dunaway at length about the contents of the letter.  On cross-examination, Dunaway recalled Summers had told her he "left" Jericho because a

staffer had placed his hands on him—not that he had been discharged. Asked if Summers told her the Jericho staffer choked him, she replied, "I don't know. He said put their hands on him is what Mr. Summers said." She had no recollection Summers told her he was actually choked. In response to defense counsel's characterization of the contact that allegedly took place as an "assault," Dunaway testified, "I don't know that he was assaulted [¶] . . . [¶] I don't believe that there was an assault that occurred [¶] . . . [¶] [T]he way Mr. Summers presented it to me was not in the manner that he'd been assaulted." In response to defense counsel's questions, Dunaway stated she took no steps to investigate Summers's allegation that he had been assaulted. She also acknowledged she had no knowledge about whether Nick, the Jericho staffer with whom she spoke, was personally involved in Summers's discharge or whether he was an eyewitness to the any of the allegations contained in the letter. Dunaway had no knowledge about the "argumentative," "confrontational," and "aggressive" behavior described in letter.

Over Summers's hearsay objection to the letter, the court accepted the Jericho letter into evidence solely for the fact Summers was discharged from Jericho. The court found the fact of his discharge was corroborated by his call to Dunaway notifying her he left. The court expressly declined to admit the letter for the truth of statements explaining the reasons for Summers's discharge, namely that he was consistently argumentative and exhibited confrontational and aggressive behavior.

The defense presented no evidence and called no witnesses.

The court revoked Summers's probation, finding he violated probation when he left the treatment program without prior consent from probation or the program. The court clarified none of its findings were based on Jericho's statements Summers was aggressive, argumentative, and confrontational or on Jericho's statement Summers needed to be escorted off the premises. Summers was sentenced to prison. This appeal followed.

3

DISCUSSION

Summers argues that the trial court improperly revoked his probation based on unreliable and inadmissible hearsay which violated his federal constitutional rights to due process and confrontation.

I.

*General Principles*

It is well established that "relaxed rules of evidence govern[ ] probation revocation proceedings[.]" (*People v. Brown* (1989) 215 Cal.App.3d 452, 454.) "Under this approach, hearsay evidence that is inadmissible to prove guilt in a criminal trial may be admissible to prove an adult probation violation under certain circumstances." (*In re Eddie M.* (2003) 31 Cal.4th 480, 501.)

A probationer has only a limited right to cross-examine and confront witnesses at a probation revocation hearing. Probation revocation proceedings are not criminal trials to which the Sixth Amendment right to confrontation applies. (*People v. Johnson* (2004) 121 Cal.App.4th 1409 (*Johnson* ).) Instead, a limited right to confrontation at probation proceedings stems from the due process clause of the Fourteenth Amendment. (*Id.* at p. 1411.) At a probation hearing, due process requires that the defendant generally be given the right to confront and cross-examine witnesses unless the hearing officer specifically finds good cause for not allowing confrontation. (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 786.)

For the admission of routine *documentary* hearsay evidence at a probation hearing, due process requires only a showing of sufficient indicia of the document's reliability. (*People v. Maki* (1985) 39 Cal.3d 707, 709 (*Maki*) [car rental invoice and hotel receipt]; *Johnson*, *supra*, 121 Cal.App.4th at pp. 1410-1413 [laboratory report showing that seized substance was cocaine]; see *People v. Arreola* (1994) 7 Cal.4th 1144, 1156-1157 (*Arreola*) [distinguishing documentary hearsay evidence from testimonial hearsay evidence].) Sufficient reliability may be established from admissible testimony, or the document itself, indicating that the document is what it purports to be, and the absence of any evidence to the contrary. (*Maki, supra*, 39 Cal.3d at p. 717 [invoice and hotel receipt

4

had sufficient indicia of reliability where they each bore the issuing company's name and the defendant's signature, the documents appeared to be of the type customarily relied upon, and there was no evidence tending to contradict the information in the invoice or the inference for which it was used]; *Johnson, supra*, 121 Cal.App.4th at pp. 1410-1413 [laboratory report showing seized substance to be cocaine was properly admitted at a probation revocation hearing, where a police officer testified that the report was identified by case number and by the defendant's name and came from the crime laboratory that routinely tested narcotics for the police department, and defense counsel made no claim that the report was untrustworthy in any specific way].)

On the other hand, to satisfy due process for the admission of *testimonial* hearsay evidence, a showing of "good cause" to excuse the live testimony is required. (*People v. Winson* (1981) 29 Cal.3d 711, 713-714 [admission of transcript of witness's preliminary hearing testimony at a revocation hearing required showing of unavailability or other good cause]; *Arreola*, *supra*, 7 Cal.4th at pp. 1155-1156 [admission of transcript of witness's preliminary hearing testimony required showing of good cause].) Good cause may be demonstrated by a showing that the declarant is unavailable, the declarant can be brought to the hearing only through great difficulty or expense, or the declarant's presence would pose a risk of harm to the declarant. (*Id.* at pp. 1159-1160.)

"Although a court may not act arbitrarily or capriciously in revoking probation [citation], its discretion in this matter is very broad [citation]." (*People v. Breaux* (1980) 101 Cal.App.3d 468, 475.) We review the revocation of probation for abuse of discretion. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 443, 445.) A revocation of probation will be reversed only in extreme circumstances. (*Id.* at p. 443.)

II.

*The Trial Court Did Not Err in Admitting the Jericho Letter Solely for the Fact Summers Had Been Discharged from the Treatment Program*

*People v. O'Connell* (2003) 107 Cal.App.4th 1062 (*O'Connell*), involved facts similar to those here. There, the defendant's probation officer alleged the defendant had violated the terms of his deferred entry of judgment, which required he attend drug

5

counseling sessions. (*Id.* at p. 1064.) At a hearing on the defendant's alleged violation, the trial court received into evidence a one-page hearsay letter from the counseling program reporting the defendant had been terminated from the program for too many absences. (*Id.* at pp. 1064-1065.) Overruling the defendant's hearsay objection to the letter, the trial court found that the "'authenticity'" of the letter from the treatment program was "'sufficiently based.'" (*Id.* at p. 1065.) The Court of Appeal affirmed the trial court, deeming the report from the program manager to be "akin to the documentary evidence that traditionally has been admissible at probation revocation proceedings" and "bore the requisite indicia of reliability and trustworthiness so as to be admissible." (*Id.* at p. 1067.) Unlike cases in which the prosecution proposed to use former testimony to establish a probation violation, the court determined the program manager's "report was prepared contemporaneously to, and specifically for, the hearing where [the defendant's] lack of compliance with the deferred entry of judgment program was at issue. [¶] The [trial] court noted that such reports were routinely received without undertaking the added burden of calling the author to authenticate it because the reports were prepared in response to a referral from the court." (*Id.* at p. 1067.)

As in *O'Connell*, the Jericho letter—a discharge summary from a drug treatment program—also bore the requisite indicia of reliability and trustworthiness so as to be admissible. Dunaway, Summers's probation officer, testified Jericho communicated with probation about a probationer's status in the program and would make contact with probation if someone was discharged early. Probation relied on these communications for its reports and to know how a probationer was doing. Dunaway received the Jericho letter by fax and by mail shortly after it was written. Dated June 23, 2014, the letter was prepared contemporaneously with Summers's discharge from the program a few days earlier. Further, around the same time, on June 24 or 25, "[Summers] called [Dunaway] to let [her] know that he'd been discharged from the program." After speaking with Summers, Dunaway also spoke with Nick, a Jericho staffer, who provided Dunaway information about Summers's discharge and told her Summers had to be escorted off the

6

premises because he would not leave. The record is replete with indicia of the Jericho letter's reliability. Just as in *O'Connell*, no showing of good cause was required.

Nonetheless, Summers contends the "trial court [in *People v. Shepherd* (2007) 151 Cal.App.4th 1193 (*Shepherd*)] was faced with a situation much like [this] one" and relies heavily on *Shepherd* to argue the Jericho letter contains the type of nonroutine, nonfoundational testimonial evidence *Shepherd* held requires good cause for admission. Summers contends the hearsay evidence at issue in *Shepherd* was "a document that informed the court that Mr. Sheppard [sic] had been asked to leave his treatment program and why," and "[h]ere, just as in *Shepherd*, the hearsay is a letter stating that Mr. Summers was discharged from his treatment program and why."[1] This fundamentally misreads *Shepherd*.

In *Shepherd*, the prosecution alleged the defendant had violated the terms of his probation by consuming alcohol. (*Shepherd*, *supra*, 151 Cal.App.4th at p. 1196.) At his revocation hearing, the defendant's probation officer testified he had been informed by a treatment program administrator the defendant had smelled of and tested positive for alcohol consumption. (*Id.* at p. 1197.) The court ruled the probation officer's testimony was testimonial hearsay evidence requiring "good cause" to be admissible, rather than the more lenient "'indicia of reliability'" standard. (*Id.* at p. 1201.)

Contrary to Summers's assertion, the wrongfully admitted evidence at issue in *Shepherd* was not "a document[.]" "At issue [was] the trial court's decision to admit into evidence . . . hearsay *testimony from appellant's probation officer*[.]" (*Shepherd*, *supra*, 151 Cal.App.4th at p. 1198, italics added.) In fact, the court made clear: "[N]o other evidence supported [the] alleged out-of-court statements[.]" (*Ibid.*) In contrast to the *live testimony* at issue in *Shepherd*, this case concerns the admissibility of a *document* reporting on a discharge for which there are numerous indicia of reliability as discussed above. *Shepherd*'s holding that good cause is necessary for a probation officer to testify

---

[1] These statements are taken from Summers's reply brief, which does not comply with the requirements that all briefs be consecutively paginated. (Cal. Rules of Court, rule 8.204(b)(7).)

about what someone else told him about a defendant's specific conduct has no bearing on the standard to be applied to a discharge summary sent to probation relaying a probationer's status in a treatment program. *Shepherd* does not change the long-standing rule that routine documents—such as a treatment program's discharge summary—may be admitted at a probation hearing upon a showing of its trustworthiness or reliability.

Even so, Summers argues the prosecution failed to show the hearsay evidence was reliable and points to several problems with the corroboration evidence the court considered. He scoffs at the prosecution's effort to offer up Summers's presence in the courtroom as evidence corroborating his discharge, but the objection is unwarranted because the trial court never relied on this fact in finding the Jericho letter reliable. Summers further contends his statements to Dunaway do not corroborate the Jericho letter because they provide no clear evidence that he said he was discharged. This is a distinction without a difference. Even accepting Summers told Dunaway he "left" Jericho, this does not change the fact that he was not in the treatment program he was required to be in as a condition of probation, and there is no evidence he left the program with the necessary consent. Moreover, even without Summers's statement to Dunaway, other evidence—Nick's statements to Dunaway confirming Summers's discharge in particular—provides adequate corroboration to establish the Jericho letter's reliability.

Summers argues other reasons the letter was unreliable; he describes it as vague and conclusory and cites the absence of any eyewitness testimony at the hearing about Summers's alleged offensive behavior. Summers contends, "The accusations were of the sort that cross examination would be fruitful and helpful to the trier of fact in determining whether a probationer had violated the rules of his probation[.]" But these arguments misunderstand the scope of the trial court's evidentiary ruling. Contrary to Summers's interpretation, the trial court did not admit the Jericho letter wholesale. The trial court "accept[ed] [the] letter for evidence of the fact that [Summers] was discharged." While the letter explains Summers was discharged for being "consistently argumentative" and for "confrontational behavior," the court was clear that it did not admit the letter for the truth of such statements. In fact, the trial expressly stated its

8

evidentiary ruling would not be based on "any findings . . . that Jericho feels that he was . . . argumentative and confrontational" and deemed whether Summers "was escorted off the premises [to be] really . . . irrelevant."

Because the hearsay evidence admitted by the trial court was restricted to the fact of Summers's discharge—not the reasons for his discharge—Summers's objections are misplaced. Given Summers's probation was conditioned on completing a treatment program, the basis for revoking his probation was established once the Jericho letter demonstrated he was no longer in the program. The information contained in the letter about why Summers was discharged was simply extraneous to the trial court's determination that Summers had violated a term of his probation. Accordingly, no eyewitness was necessary to explain Summers's status—the simple fact of his discharge. Cross-examination of a Jericho witness on this basic fact would not have served any useful purpose. The demeanor on the stand of such a witness would not have been significant in evaluating the truthfulness of testimony on Summers's status at Jericho because it was clear Summers was no longer in the program. (See *Arreola*, *supra*, 7 Cal.4th at p. 1157.)

Summers also identifies critical factual disputes he contends precluded any finding of reliability, but this fails for similar reasons. Summers contends his statements to Dunaway regarding someone placing "their hands on him" presented a dispute of fact requiring testing by cross-examination. Again, the subject of the proffered factual dispute—whether or not Summers was assaulted at Jericho—does not change the fact that Summers had been discharged from the program he was required to participate in and complete as a condition of his probation. Even under Summers's account to Dunaway of how or why he left the program, it was no abuse of discretion for the trial court to find a violation of his probation terms given the absence of evidence he had the proper consent to leave. Additionally, Summers provides no authority for his argument that conflicts of evidence at a probation revocation hearing mandate testing by cross-examination, and we consider it waived. (See *Regents of University of California v. Sheily* (2004) 122

Cal.App.4th 824, 826, fn. 1 [courts may disregard legal arguments not supported by citation to legal authority].)[2]

Finally, Summers contends disregarding the circumstances of his discharge as irrelevant is "nonsense" and "the evidence that Mr. Summers left his program because a staff member was choking him is relevant . . . to whether or not he willfully violated his probation." This overstates the record, which contains no evidence—hearsay or any other kind of evidence—that Summers was choked or assaulted. A number of times at the hearing, defense counsel attempted to extract such hearsay testimony from Dunaway (the only witness to testify) based on statements Summers purportedly made to her. In no instance, did Dunaway state Summers told her he was assaulted or choked. Nothing prevented the defense from calling its own witnesses or presenting further evidence, which defense counsel expressly declined to do. The trial court did not err by failing to consider facts not before it. [3]

---

[2] To the extent there were disputed facts pertinent to the court's ruling, the trial court was well within its authority to resolve such disputes. At a probation revocation hearing, "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) On appeal, it is not our role to reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) At a probation revocation hearing, our review is "limited to the determination of whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision." (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848, fn. omitted.) "[A]ll conflicting evidence will be resolved in favor of the decision." (*Id.* at p. 849, fn. omitted.)

[3] We also decline to consider arguments not properly before us. Summers states, "[T]he District Court [*sic*] erred in permitting Ms. Dunaway to testify to the [*sic*] Mr. Summer's [*sic*] status with the Jericho project based on the oral hearsay of Nick and the written hearsay in the letter from the Jericho project." We do not consider this new issue as to the admissibility of Dunaway's testimony given Summers's failure to object to such at the trial court and to develop this line of argument on appeal. (See *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 800-801 [reviewing court will not consider issue unless appellant demonstrates it was raised in court below]; *Picerne Construction Corp. v. Villas* (2016) 244 Cal.App.4th 1201, 1211 [court declined to examine undeveloped claim that witness's testimony was hearsay].)

In sum, we conclude the trial court did not abuse its discretion in admitting the Jericho letter in order to establish that Summers had violated the terms of his probation which prohibited him from leaving the program absent probation's or the program's consent.  The letter bore sufficient indicia of reliability to justify its admission without the need for the prosecution to show good cause.  In these circumstances, the court did not abuse its discretion in revoking Summers's probation.

Because we conclude there was no error, we do not consider whether any error was harmless.

DISPOSITION

The judgment is affirmed.

_____

Jones, P.J.

We concur:

_____

Needham, J.

_____

Bruiniers, J.

11